DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which, on September 22, 2005, entered a judgment granting permanent custody of appellant Teri L.'s three children to Lucas County Children's Services ("LCCS"). For the reasons that follow, we affirm the trial court's decision.
 {¶ 2} On November 21, 2003, LCCS filed a complaint in dependency, neglect and a motion for a shelter care hearing as to Johnathon A., born in 1999, and Sara Z., born in 2002. Appellant was named as the natural mother of the children and Kurt Z. was named as Sara's father. The complaint was later amended to add Bruce A. as Johnathon's father. The complaint alleged that on October 31, 2003, LCCS opened a case file in this matter as a result of a referral that the family's living conditions "were deplorable, with junk and garbage strewn all about, and the home was infested with fleas." LCCS attempted to provide services for the family. On November 20, 2003, at approximately 3:00 a.m., the police brought the children to LCCS after appellant was admitted to the hospital due to an overdose of prescription drugs; the children had been left with an inappropriate caretaker. According to LCCS, appellant believed that she was having a nervous breakdown and was overwhelmed by the care of her children. On November 24, 2003, LCCS was awarded temporary custody of the children.
 {¶ 3} At the January 21, 2004 adjudicatory hearing, Johnathon and Sara were found to be neglected and LCCS was awarded continued temporary custody. The original case plan had a goal of reunification by September 1, 2004, and required that appellant undergo a mental health and medical assessment, attend parenting classes, complete the substance abuse treatment program and remain alcohol and drug free, and attend regular visits with her children. On June 16, 2004, the case plan was amended because Bruce A., after a long absence, had recently met Johnathon and wished to have additional visitation. Due to a substance abuse problem, Bruce was also required to receive drug treatment and attend parenting and domestic violence programs.
 {¶ 4} On September 24, 2004, LCCS filed a motion for permanent custody of Sara. LCCS stated that appellant had failed to satisfactorily complete the services provided in the case plan. As to Kurt, Sara's father, he had been incarcerated and had failed to complete substance abuse treatment. Regarding Johnathon, LCCS requested an extension of temporary custody based on Bruce A.'s progress with regard to the case plan.
 {¶ 5} On October 25, 2004, LCCS filed an original complaint for permanent custody of appellant and Kurt's daughter, Sierra Z., who had recently been born. LCCS was granted temporary custody. On March 4, 2005, Sierra was adjudicated a dependent child as to appellant. On June 23, 2005, the trial court adjudicated Sierra a dependent as to her father, Kurt Z.
 {¶ 6} On June 23 and August 4, 2005, a consolidated permanent custody disposition hearing was held as to all three children; the following evidence was presented. LCCS caseworker, Joan Barkenquast, testified that in September and October 2003, LCCS received two referrals regarding the living conditions in appellant's and Kurt Z.'s home. The home was filled with clutter and had a noticeable odor. There was also a concern regarding the lack of food in the home and that the children did not have clothing. According to Barkenquast, at that time a community advocate was assigned to the family to help clean the home. Food and clothing vouchers were given and a bug bomb was arranged for because the home was flea infested.
 {¶ 7} Barkenquast testified that in November 2003, she became the family's caseworker. At that time, the children were still in the home; Barkenquast made a referral for parenting classes and was arranging for day care. The agency filed a complaint in dependency following the November 20 incident where the children were taken to LCCS. Barkenquast stated that appellant has one older child, an eight year-old girl, whose father has custody and who is living with the child's maternal grandmother.
 {¶ 8} Regarding Bruce A., Johnathon's father, Barkenquast testified that she first met with him at the agency in January 2004. Bruce stated that he wished to have a relationship with his son. At that time, Bruce and his girlfriend had just had a baby and the mother and he were in drug court. Barkenquast indicated to him that prior to reentering Johnathon's life, he would need to address his drug abuse and domestic violence issues. Bruce began the required services and their first meeting took place in April. Due to Johnathon's special needs, including a speech delay and ADHD, Bruce and his then wife were not sure they could handle him. Eventually, Bruce relapsed and the visits ended.
 {¶ 9} As to Kurt, Sara and Sierra's father, he never finished substance abuse treatment. Visitation at the agency was sporadic and January 2005, was the date of his last visit. In February 2005, Kurt expressed a desire to reconnect with services but he never followed through.
 {¶ 10} Barkenquast testified that in December 2003, she referred appellant to parenting classes, a substance abuse assessment, and a diagnostic assessment; however, the substance abuse issue predominated and that became the focus. According to Barkenquast, visitation at the agency was erratic and; as a result, appellant was required to arrive one hour early and then the children would be delivered.
 {¶ 11} In June 2004, Barkenquast learned that appellant was pregnant. During this time, appellant and Kurt were evicted from their apartment. Appellant also failed to follow through with her mental health diagnostic assessment. In August, appellant began an inpatient substance abuse program and began receiving prenatal care. Appellant completed the program in February 2005, and began living at the Aurora House, a women's shelter.
 {¶ 12} Visitation with appellant's three children was switched from the agency to the Aurora House following appellant's move. Eventually, the visits were increased to all day Friday and Saturday. Barkenquast testified that these visits did not go well. There were concerns that Sierra was not being fed and that Sara's and Sierra's diapers were not being changed. There were also concerns that appellant was not supervising the children. Specifically, Barkenquast testified that on one occasion appellant was being interviewed by a college student and forgot that she left Sierra in another room. Also, there was an incident where appellant was outside smoking and left the children inside. As a result of these concerns, the visits were moved back to the agency.
 {¶ 13} Barkenquast testified that at the time of the hearing, she believed that appellant was still in the probationary period at the Aurora House. Some of the problems at the shelter stemmed from appellant's desire, in contravention of the shelter's rules, to maintain a relationship with Kurt who had not completed the required services. Appellant also had trouble with time management and was working on those skills.
 {¶ 14} Regarding the children, Barkenquast testified that Sara is in a foster home with her sister, Sierra, and that the foster parents wish to adopt them. Sara had been out of her parents' custody since November 2003. Johnathon is also in a foster home and his behavior problems, due to a structured environment, counseling, and medication, have improved significantly. Barkenquast testified that she believed that the children would be at risk if they were returned to appellant. Barkenquast stated that it took appellant nine months to really begin working on the case plan and that, only since March 2005, had appellant really taken an interest in gaining custody of her children.
 {¶ 15} During cross-examination, Barkenquast was questioned regarding what programs, if any, that appellant had been referred to that she failed to attend. Barkenquast stated that appellant's name had come up three times for parenting classes but, at that time, they would not accept her because she had not begun substance abuse or attended counseling. Barkenquast admitted that appellant had recently completed the requirements but that she could not attend interactive parenting classes because there were no openings. Barkenquast was also questioned regarding her knowledge of the parenting programs that appellant allegedly had completed.
 {¶ 16} Barkenquast also admitted that since August 2004, appellant's visitation had been very consistent. When questioned, Barkenquast stated that her reasons for moving the visits from the Aurora House back to the agency were that the children were left unsupervised, that appellant failed to properly warm up Sierra's bottles, and that the girls' diapers were changed too infrequently. Barkenquast did agree that as of March 2005, appellant had been compliant in attending all her meetings.
 {¶ 17} Johnathon's foster parent, Ronald D., testified next. Ronald testified that Johnathon was placed in his home in December 2003, on his fourth birthday. At that time, Johnathon was "a very angry, confused little boy." Ronald stated that Johnathon now takes medication for allergies, wears glasses, and takes ADHD medication. Johnathon also attends behavioral and speech therapy. Ronald testified that when Johnathon first arrived at their home he was very aggressive with other children and animals and that he had a "terrible" time interacting with other children. Ronald stated that since Johnathon has been in their home he has noticed improvements in his behavior.
 {¶ 18} Regarding the extended Aurora House visits, Ronald testified that on the fourth all day visit, when he and his wife arrived to pick up Johnathon, Johnathon told them that his mom had asked him to watch his sisters while she went outside.
 {¶ 19} Ronald testified that due to his age, 58, he was not interested in adopting Johnathon but that a family friend was. The friend and Johnathon are well acquainted and they get along very well. The friend is taking adoption classes and is willing to permit Johnathon to see his sisters. The friend is aware of Johnathon's special needs and is committed to pursuing a permanent plan. Ronald testified that Johnathon calls him and his wife grandma and grandpa and that, if adopted, they would remain involved with him.
 {¶ 20} Michelle D., foster parent of Sara and Sierra, testified that Sierra was placed in the home right after her birth in October 2004; Sara came to the home shortly thereafter. The children were receiving early intervention services; Sierra, for developmental delays, Sara, for emotional issues. Michelle stated that for visits with appellant, she would provide bottles and diapers. Michelle testified that she instructed appellant to warm up Sierra's six ounce bottles; appellant failed to warm them up and Sierra refused to drink a cold bottle. Michelle stated that following such visits Sierra was very hungry and would drink eight to ten ounces of formula. Regarding diaper changes, Michelle testified that after an eight-hour visit at the Aurora House Sara's diaper was "soaking wet" and that she had only been changed one time.
 {¶ 21} Michelle testified that one Saturday she returned to pick up the girls and she saw appellant coming in from outside. Michelle and her husband followed appellant in and could hear Sierra "screaming" and "crying." Michelle stated that Sierra was in the living room lying on a chair, Johnathon was in another room, and they did not immediately see Sara. There was another adult in the room with three children.
 {¶ 22} Michelle testified that she was interested in adopting the girls and that they would have contact with Johnathon. Michelle also testified that appellant, while at the Aurora House, stated that she could "play the game" and stay clean and sober long enough to get the children back and then she and Kurt could reunify and live their lives.
 {¶ 23} During cross-examination, Michelle was questioned regarding a notebook she was asked to keep by the caseworker to write down any incidents that did not "feel right." Michelle acknowledged that in the prior eight months appellant had only missed one visit. Michelle was also questioned regarding the amount of diapers Sara, a two-year old, would need versus an infant and whether a change in eating habits when in a new environment would seem unusual.
 {¶ 24} Also testifying was Tom D., Michelle's wife. Regarding the Aurora House incident, he stated that a woman was holding Sierra who was crying. Tom also testified that if they adopted the girls they would be allowed to have contact with Johnathon. He stated that Johnathon had already been to their house.
 {¶ 25} Barbara S. testified that Johnathon and Sara were placed in their home on November 22, 2003. Johnathon was "out of control" and, after a few days, the family realized that they were not equipped to handle him. Sara slept a lot the first few days and seemed a little "glazed." The children were covered with flea bites which they treated with ointment. The foster parents needed respite care almost immediately due to a planned trip. They took the two children to Ronald D.'s home where Johnathon eventually stayed.
 {¶ 26} Barbara testified that Sara's personality really began to blossom at their home. In October 2004, Barbara took Sara to the hospital when Sierra was born. While they were there, appellant indicated that she wanted to smoke so they wheeled her down to the parking lot where there is a designated smoking area. While there, appellant began talking with a woman and ignored Sara.
 {¶ 27} Barbara testified that the families began working on the transition prior to Sara's January 2005 move to Sierra's foster home; the transition went smoothly. Barbara testified that she still sees Sara and that, although Sara is happy to see her and willingly goes with her, she is happy to return to her foster family.
 {¶ 28} During cross-examination, Barbara acknowledged that Sara's and Sierra's foster parents smoke; however, they only do it outside. Barbara also recalled an event where Johnathon told her husband that his mother smokes crack and demonstrated how she did it.
 {¶ 29} Tanya Roach, case manager at the Aurora House, testified that her responsibilities are to work with the women to get them back in the community leading a sober lifestyle. Roach testified that she first met appellant at her February 2005 intake prior to moving into the house. When appellant moved into the home she was informed that she could not have any contact with Kurt because it was unclear whether or not he was will using drugs. At that time, appellant agreed to abide by that requirement.
 {¶ 30} Roach explained that when the women first enter the Aurora House they are placed on a 30-day probation. Appellant was proceeding along fine until two letters she sent to Kurt were returned due to an "insufficient address." Appellant also admitted that she had been trying to call Kurt. Appellant's probation was then extended to 60 days. Roach testified that appellant would also call out to men on the street. When confronted with this behavior, appellant said she could not help it because she loved men. Roach testified that appellant did pass her probationary period and move to phase one of the program.
 {¶ 31} Once Roach got to know appellant she recognized that time management was a problem for her. They worked with appellant to put all her appointments on one sheet of paper so she could see the whole schedule together, not just bits and pieces.
 {¶ 32} Roach explained that at the Aurora House there is a disciplinary process where points are given for various infractions of the house rules. Roach testified that at that time appellant had 11 permanent points; 12 permanent points means that you can be discharged. Roach explained that prior to giving points, they prefer to give restrictions such as limiting weekend passes or television viewing. Roach testified that appellant had recently begun working a full time job and that it really had not caused a problem with her attendance at meetings.
 {¶ 33} Regarding visitation at the house, Roach testified that the visits were initially twice weekly for an hour-and-a-half. After the first few visits, appellant admitted that she was overwhelmed and requested an early smoking break to relieve her stress.
 {¶ 34} The all day visits began Friday, March 11, 2005. Roach testified that the first day went smoothly until she noticed that appellant was lying on Johnathon's back; appellant stated that it was the only way she could control him. Roach suggested that appellant try using a time-out. The next extended visit where Roach was present was on March 18. On that date, a college student was interviewing appellant regarding women in homeless situations. Appellant forgot about Sierra and another woman had taken her out of her infant seat and was trying to comfort her. Roach testified that there is a strict policy that states that the residents' children are to be with them at all times; no one else is to watch their children. Roach did acknowledge that appellant was consistently attending her children's appointments.
 {¶ 35} Roach testified that as of the hearing, appellant was still in phase one of the program. Appellant had been considered for phase two, but some concerns arose regarding her behavior. Roach stated that phase two includes the step-up program where the women reside in their own apartments to prepare them for permanent housing.
 {¶ 36} During cross-examination, Roach acknowledged that it was a positive step that appellant was employed and that she is working on her time management issues. Appellant had also been doing very well with her substance abuse issues.
 {¶ 37} Appellant testified on her own behalf. Appellant acknowledged that about a year ago she had a bad drug problem. She started out-patient treatment but, because she was still using drugs, she placed herself in the inpatient program. Appellant testified that she also had a problem with prescription drugs following their legal use for back pain. Appellant stated that she had been drug free for one year.
 {¶ 38} Appellant testified that she believes that it is in her children's best interests to be returned to her because she can now care for them. Appellant stated that she can offer them stability, positive discipline, good schooling, and counseling. Appellant had also completed several different parenting classes and has educated herself regarding Johnathon's ADHD. Appellant is also addressing her time management issues and is enjoying her new job.
 {¶ 39} Regarding visitation, appellant testified that she has not missed one and that she has bonded with her children. Appellant believes that her children interact well with each other and that things have greatly improved. Appellant testified that her plan for the future is to get her children back, go to family counseling, get an apartment and raise her children in a "very structured and safe environment."
 {¶ 40} During cross-examination, appellant testified that she has four children. Her oldest is eight-years old and her child's father, appellant's ex-husband, has custody. Appellant admitted that she had not been honest regarding her drug dependency; as late as February 2004, she stated at a diagnostic assessment that she had only used crack one time. Appellant also admitted that she never attended a women's group that she was referred to. Also, up until her August 2004 inpatient treatment, she was consistently using cocaine while pregnant with Sierra and was erratic with visitation. During this time, appellant was also convicted of receiving stolen property and was placed on probation.
 {¶ 41} Appellant testified that she currently does not have enough money saved to get an apartment but that she is working on it. Appellant is also working on paying her fines to have her driver's license reinstated; it was suspended due to her failure to license her dogs. Her car has been impounded for some time.
 {¶ 42} Appellant was asked what a typical day would be like if she was given custody of her children; she described the she would get up at 4:30 a.m. and get the children up by 5:00 a.m. so she would attend a 7:00 a.m. meeting. At 8:05 a.m. they would get on the bus and she would take them to their day care. Appellant stated that she is requesting that her work hours change to 9:00 a.m. to 5:00 p.m. and that she be transferred to a more convenient location. If so, she would be able to take the bus to her job and pick up the children prior to the day care's 6:30 p.m. closing time. Appellant stated that her boss has been very accommodating with Johnathon's therapy sessions. Appellant was questioned further about her housing and admitted that for three of the past four years she had been in sheltered living.
 {¶ 43} On September 22, 2005, the trial court awarded permanent custody of appellant's children to LCCS. Appellant filed a timely notice of appeal and raises the following assignments of error:
 {¶ 44} "I. The trial court erred in finding that the Lucas County Children Services Board had made a reasonable effort to reunify the minor children with appellant.
 {¶ 45} "II. The trial court erred in granting Lucas County Children Services Board's motion for permanent custody as it was against the manifest weight of the evidence to grant it."
 {¶ 46} Because appellant's assignments of error are interrelated they will be addressed together. Appellant contends that LCCS failed to make reasonable efforts to reunify appellant with her children and that LCCS failed to present clear and convincing evidence to support an award of permanent custody.
 {¶ 47} The disposition of a child determined to be dependent, abused or neglected is controlled by R.C. 2151.353 and the court may enter any order of disposition provided for in R.C.2151.353(A). However, before the court can grant permanent custody of a child to the agency, the court must determine: 1) pursuant to R.C. 2151.414(E) that the child cannot or should not be placed with one of his parents within a reasonable time; and 2) pursuant to R.C. 2151.414(D), that the permanent commitment is in the best interest of the child. R.C. 2151.353(A)(4). R.C.2151.414(E) provides that, in determining whether or not a child can or should be placed with a parent within a reasonable time, the court shall consider all relevant evidence. If, however, the court determines by clear and convincing evidence that any one of sixteen factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time. The trial court found R.C. 2151.414(E)(1) to apply to Johnathon and Sara,[1] it provides:
 {¶ 48} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 49} The court found the following three factors to apply to all three children:
 {¶ 50} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 51} "* * *
 {¶ 52} "(10) The parent has abandoned the child.[2]
 {¶ 53} "* * *.
 {¶ 54} "(16) Any other factor the court considers relevant." R.C. 2151.414(E).
 {¶ 55} If, however, the child has been in the custody of the agency for 12 or more months of a consecutive 22 month period, the court may grant permanent custody to the agency based only on a finding that it is in the best interests of the child. R.C.2151.414(B)(1)(d). While this section applied to Johnathon, the court still found several factors under R.C.2151.414(E).[3]
 {¶ 56} In determining the best interest of the child, R.C.2151.414(D) directs that the court shall consider all relevant factors, including but not limited to:
 {¶ 57} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 58} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 59} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 60} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 61} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 62} As set forth in the above-quoted statutory sections, the trial court's findings must be supported by clear and convincing evidence. Clear and convincing evidence is that proof which establishes in the mind of the trier of fact a firm conviction as to the allegations sought to be proved. Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 63} Upon careful review of the record in this case, we find that LCCS made reasonable efforts to reunify appellant with her children, and that the trial court's decision granting LCCS permanent custody was supported by clear and convincing evidence. LCCS presented ample testimony regarding the services it provided to appellant and the referrals it made on her behalf.
 {¶ 64} While we do acknowledge that appellant has had recent success with her substance abuse and time management issues, at the hearing testimony was presented demonstrating that appellant has still failed to remedy all the issues which caused the removal of her children. First, as of the hearing, appellant had still not progressed to phase two at the Aurora House and case manager Tanya Roach testified that she still sees "phase one" behaviors. Second, appellant has not established appropriate housing and has resided in shelters for three out of the past four years. Appellant stated that if she was discharged from the Aurora House she would just move to another shelter. Next, there was testimony presented that appellant had trouble properly caring for her children including failing to properly feed and diaper the girls, leaving them with inappropriate caregivers, and inappropriate discipline of Johnathon. Finally, although appellant did attend mental health diagnostic assessments, she failed to follow through with counseling or attend a women's group that she had been referred to. Further, regarding the best interests of the children, Johnathon and Sara have been in the LCCS's custody since November 2003, and Sierra since her birth in October 2004. Testimony was presented that the girls have a family that is willing to adopt them and that Johnathon had a family interested in adopting him; both families agree that the siblings will have a relationship.
 {¶ 65} Based on the foregoing, we find that the evidence clearly and convincingly supports the trial court's findings that the children cannot or should not be placed with appellant and the permanent custody to LCCS is in their best interests. Appellant's first and second assignments of error are not well-taken.
 {¶ 66} On consideration whereof, we find that substantial justice was done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Singer, P.J., Skow, J., concur.
[1] As to Sierra, because LCCS filed an original complaint for permanent custody pursuant to R.C. 2151.353(A)(4), it was not required to formulate a reunification plan. See In re Baby GirlBaxter (1985), 17 Ohio St.3d 229, paragraph two of the syllabus.
[2] The court found that Bruce A. had abandoned Johnathon, and that Kurt Z. had abandoned Sara and Sierra.
[3] Although Sara had been in the agency's custody for as long as Johnathon, the permanent custody motion was filed prior to the annual review.