[Cite as *In re R.P.*, 2018-Ohio-885.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re R.P.

Court of Appeals Nos. L-17-1267

Trial Court No. JC 16253252

**DECISION AND JUDGMENT**

Decided: March 9, 2018

* * * * *

Laurel A. Kendall, for appellant.

Jill E. Wolff, for appellee.

* * * * *

**MAYLE, P.J.**

{¶ 1} Defendant-appellant, A.B.-P., appeals the October 2, 2017 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her daughter, R.P., to Lucas County Children's Services ("LCCS"). For the following reasons, we affirm the trial court judgment.

# I. Background

## A. LCCS is awarded interim, then temporary custody of R.P.

{¶ 2} R.P. was born in April of 2006, and is the daughter of appellant, A.B.-P. ("mother"), and J.P. ("father"). LCCS filed a complaint in dependency and neglect on February 5, 2016, after receiving referrals in January of 2016, alleging that R.P. had not attended school since September of 2015; her parents were abusing drugs; she was living in a home with no gas or running water; the condition of the home was "deplorable;" her mother was spending all of her money on drugs; there were transient people in and out of the home; the family had a vicious dog; and R.P. had witnessed incidents of domestic abuse between her parents. The agency had received similar complaints about the family in September of 2015, and mother had "an extensive referral history" dating back even further.

{¶ 3} Following a shelter care hearing on February 5, 2016, the trial court awarded interim custody of R.P. to LCCS and appointed a guardian ad litem ("GAL") for R.P. It also ordered mother and father to undergo a dual diagnostic assessment and to submit to drug testing.

{¶ 4} R.P. could not immediately be placed with a foster family, and in the meantime, mother "took off" with R.P. Their whereabouts were unknown for approximately six weeks. Through an anonymous call, LCCS learned that mother and R.P. were residing with R.P.'s paternal grandmother.

2.

{¶ 5} On March 28, 2016, LCCS arranged for an emergency placement for R.P., and the next day she was placed in a therapeutic foster home. Her father died two days later. On April 15, 2016, R.P. was adjudged dependent and neglected. Temporary custody was awarded to LCCS.

### B. A case plan is devised.

{¶ 6} Mother did not initially cooperate with LCCS, however, a case plan was filed with the juvenile court on March 9, 2016, with a goal of reunification. The case plan was amended on May 20, 2016, once mother made herself available to LCCS. Consistent with the juvenile court's interim custody order, mother was required to undergo a dual diagnostic assessment to evaluate the need for mental health and substance abuse treatment, and was required to submit to random urine screens. Because there were concerns about the history of domestic violence, she was asked to engage in a domestic violence victims group. She was also required to obtain suitable housing and to seek employment. Visits between mother and R.P. were permitted to take place at LCCS at least one time per week.

### C. Mother begins services.

{¶ 7} Mother failed to engage in the diagnostic assessment until July of 2016. Once she did, she was referred for mental health and substance abuse treatment. She began weekly counseling, and was scheduled for intensive outpatient treatment ("IOP") and a psychiatric evaluation. Mother submitted to a urine screen on July 5, 2016, and it was negative, but she tested positive for cocaine on July 8, 2016. She denied cocaine use despite the positive screen.

3.

**{¶ 8}** From July until roughly October or November of 2016, mother was "fairly compliant" in participating in services. She completed IOP, but did not engage in aftercare. She completed a domestic violence victims' survivors course in August of 2016, but it consisted of individual counseling instead of the group counseling that LCCS required of her.

**{¶ 9}** Despite participating in services, mother missed 11 urine screens and provided a diluted sample in August of 2016. She offered many excuses for missing the urine screens. In August of 2016, mother tested positive for opiates, but had a prescription for pain medication because she had been bitten by a dog.

**{¶ 10}** Mother consistently visited R.P. as allowed by the case plan.

## D. R.P. makes allegations of abuse.

**{¶ 11}** On October 25, 2016, LCCS received a referral from R.P.'s counselor indicating that R.P. had disclosed instances of abuse by her parents. Specifically, R.P. disclosed that her parents injected her with a needle and that mother was taking R.P.'s ADHD medication. An LCCS investigator met with R.P., and R.P. relayed her allegations to the investigator. R.P. said that she was given the injections to help her sleep. The investigator met with mother, who denied having injected R.P. with anything. She said that it was possible that R.P. had seen her give herself B12 injections. Because mother denied the allegations, LCCS was unable to substantiate the alleged abuse.

**{¶ 12}** More allegations by R.P. followed. On March 7, 2017, she told her counselor that two men had touched her. One, she said, was an alcoholic who stayed at her parents' house. R.P. claimed that he touched her vagina on two occasions. The other

4.

was a boy her age who touched her one time after school. On May 1, 2017, R.P. told her counselor that she does not miss how her mom smoked weed, crack cocaine, and heroin, and how other people would come over and smoke it too. And on June 6, 2017, R.P. told her counselor that she had been raped at a bar that her mom took her to. R.P. described to her caseworker that she felt "like bricks [were] coming off her back" by being able to disclose these things.

{¶ 13} Mother denied all of R.P.'s allegations of abuse.

### E. R.P. sustains traumatic brain injury in an auto accident.

{¶ 14} On November 7, 2016, R.P. was a passenger in a serious car accident and sustained a traumatic brain injury. She was hospitalized at Nationwide Children's Hospital in Columbus for nearly two months, where she was comatose for a period. Mother went to Columbus to be with R.P. Initially she was permitted to be at the child's bedside, but because arrangements could not be made for constant supervision, visits ceased.

{¶ 15} It was observed by R.P.'s caseworker and a number of medical professionals that when R.P. was in the process of coming out of her coma, she appeared to become agitated by her mother's presence in the room. The presence of her foster mother appeared to calm her.

{¶ 16} After the auto accident, R.P. was restricted from playing sports for one year. She continued to follow up with a number of doctors and therapists at Nationwide Children's Hospital, who also provided input in devising R.P.'s individualized education program ("IEP") at school.

5.

**F.  R.P.'s counselor asks that visits be reduced, then eliminated.**

{¶ 17} After R.P was released from the hospital, mother visited with R.P a couple of times.  But as R.P. started disclosing instances of abuse, her counselor observed that R.P. appeared anxious after visits with mother.  Her counselor recommended that visits be limited to once per month.

{¶ 18} In March of 2017, R.P. became very anxious and told her counselor that her mother had told her to say that she made up the allegations of abuse and that her mother said that these allegations were the reason they were apart.  R.P. told her counselor that she would tell her everything if her mom told her she could.  The counselor determined that it was in R.P.'s best interest that visits with her mother stop.  Visitation terminated effective March 23, 2017.  After visits with mother ceased, R.P.'s counselor saw a decrease in R.P.'s anxiety level.

{¶ 19} Mother was permitted to contact R.P. by phone, which she did sporadically.  R.P. sometimes did not want to talk to her, despite encouragement from her foster mother.  When R.P did speak with her mother, she often kept the conversations brief.  At some point, telephone communication stopped altogether.  Mother would later claim that she believed that she was not permitted to call her daughter.

**G.  Mother pursues services herself instead
of complying with the case plan.**

{¶ 20} Mother missed urine screens in February and March of 2017.  In March of 2017, when visits were suspended, mother was upset and wanted to meet with LCCS with her attorney.  She did not call to schedule that meeting, however, until June of 2017.  In

6.

the interim, LCCS lost contact with her. Mother did not participate in case plan services, did not submit to urine screens, and did not return phone calls. LCCS removed her from the case plan.

{¶ 21} When they finally met in June, mother reported that on April 28, 2017, she admitted herself to the psychiatric floor of Flower Hospital. She was there until May 17, 2017. Records from her stay indicated that upon admission, mother tested positive for cocaine. She claimed to have been sober for 17 years, but said that she was persuaded to use cocaine with an old high school friend. The records also showed that mother sometimes declined to participate in group therapy during her hospitalization.

{¶ 22} Upon leaving Flower, mother began staying at Sparrow's Nest. Part of her hospital discharge plan included following up with Unison Health. Mother engaged in IOP at Unison and completed those services shortly before the case progressed to trial. Required aftercare would not be completed until October 2017. Mother submitted to numerous urine screens, all of which came back negative. Her IOP counselor reported that she had perfect attendance, had maintained her sobriety, and was a compliant, cooperative patient who actively participated in group sessions.

{¶ 23} Mother successfully completed the women survivors of domestic violence course back in 2016, and had scored a 100 percent on the test that followed. In June of 2017, she began seeing a therapist for individual and cognitive processing therapy. It was expected that that therapy could be completed in October of 2017.

7.

{¶ 24} LCCS was not satisfied with mother's participation in these programs because they did not take place pursuant to a referral. This meant that mother's Unison counselors had not been advised of LCCS's specific concerns that had led to R.P.'s removal from the home.

### H. R.P. makes progress in foster care.

{¶ 25} R.P. has adjusted well to foster care. She is bonded to her foster mother, has made friends, and enjoys school. She is excited and eager to learn. She has traveled with her foster family and engages in church with them. R.P. has expressed that she wants to remain with her foster family.

{¶ 26} Because of the significant amounts of school she missed when she was in her mother's care, R.P. initially struggled at school. She is on an IEP. She engaged in tutoring the first summer she was with her foster family. The auto accident resulted in additional setbacks, and she especially struggles with math. R.P. was again referred for summer tutoring.

{¶ 27} R.P. undergoes occupational and speech therapy at Nationwide for further rehabilitation of the conditions caused by the November 2016 auto accident. She was told not to engage in sports for a year so as to avoid a head injury. She sees her counselor for weekly trauma therapy. Her counselor has said that it is important for her continued progress and social functioning that she remain in counseling and that her environment be predictable, dependable, stable, and safe.

8.

## I. LCCS is not satisfied that mother can provide suitable housing for R.P.

{¶ 28} Mother's case plan required her to obtain suitable housing. She has a history of moving around. Mother has at various times lived at the home she shared with her husband on Western Avenue. The condition of the home remains unsuitable. There is no furnace, no water heater, and no pipes in the home. Mother has claimed that she was going to fix up the house, but that has not yet occurred.

{¶ 29} For a while after R.P. was removed from the home, mother lived with a friend. Mother intended to live there with R.P., but had a falling out with the friend. After their falling out, the friend contacted LCCS and provided information that was of concern to the agency. Mother told LCCS that she does not want the agency to communicate with the friend.

{¶ 30} Mother is currently residing at the Sparrow's Nest. She has said that a relative of her late husband, K.K., has offered to help her obtain housing and is also willing to take custody of R.P. if custody cannot be returned to mother. K.K. has never met R.P. LCCS began its background check of K.K., but it has concerns because mother only recently met her and has communicated with her primarily through Facebook. Also of concern to the agency is that mother intends for her adult son to move in with her if she does not regain custody of R.P. Her son struggles with heroin addiction, and has his own history with LCCS relative to the care of his young daughter.

9.

**J. LCCS seeks permanent custody.**

{¶ 31} On May 31, 2017, LCCS moved for permanent custody. Mother filed a motion for legal custody on July 27, 2017. Both motions were tried to the juvenile court on August 30, 2017. LCCS presented testimony from R.P.'s caseworker, Lauri Wolfe, the LCCS investigator who investigated R.P.'s allegations of abuse, Melissa Coburn, and R.P.'s counselor, Rachel Tincher. Mother testified, and called two of her Unison therapists to testify—Kim Grower-Dowling and Giovanni Santacroce. The GAL also testified. The facts recited above were elicited from their testimony, as well as from the case planning documents that were filed with the court.

{¶ 32} In support of its motion for permanent custody, LCCS argued that R.P. has been in its custody for 14 of the last 22 months and is in need of a secure, predictable environment which mother has been unable to provide. It cited a number of concerns including mother's long history with the agency; ongoing concerns about mother's substance abuse issues; mother's failure to complete case plan services; mother's lack of suitable housing; mother's suggestions to R.P. that she lie to her trauma counselor; and mother's insistence that R.P.'s traumatic brain injury caused her to invent allegations of abuse. LCCS maintained that R.P. is doing well in foster care and wishes to remain with her foster family. The GAL agrees with LCCS that it is in R.P.'s best interest that permanent custody be awarded to LCCS.

{¶ 33} Mother maintained that except for two relapses, she has been sober for 17 years. She insisted that she is well along the way to substantially remedying the reasons for R.P.'s removal from her custody. She pointed to a number of unusual events that

impeded her case plan progress, including the death of her husband, R.P.'s involvement in a serious auto accident, and the decision to admit herself to Flower Hospital. She asked that she be given legal custody of her daughter, or that temporary custody of LCCS be extended until March 2018, to allow her time to establish that it is in R.P.'s best interest that she be reunified with her mother.

### G. The trial court awards permanent custody to LCCS.

{¶ 34} In a judgment entry journalized on October 2, 2017, the trial court granted LCCS's motion for permanent custody and denied mother's motion for legal custody. Under R.C. 2151.414(B)(1)(d), the court found that R.P. had been removed from her home over 17 months ago. It found by clear and convincing evidence that under R.C. 2151.353(A)(4) and R.C. 2151.414(E)(1), (2), (4), and (16), R.P. cannot or should not be placed with mother within a reasonable period of time. And it found that under R.C. 2151.414(D)(1), an award of permanent custody to LCCS is in R.P.'s best interest.

{¶ 35} Mother appealed and assigns the following errors for our review:

I. The trial court's decision to award custody to the agency was against the manifest weight of the evidence when the child's disclosures of abuse were not substantiated, were made after the child suffered a traumatic brain injury which affected her memory, and no expert medical testimony was presented to address the cognitive effects of the child's injury as regards the disclosures.

II. The trial court abused its discretion and erred to the substantial prejudice of appellant by permitting both the caseworker and the child's

counselor to testify to the lack of effect of the child's injury on her memory when neither was qualified as a medical professional.

## II. Law and Analysis

**{¶ 36}** While mother has assigned two errors which would appear to present discrete issues—i.e. whether the trial court's decision was against the manifest weight of the evidence and whether the trial court abused its discretion in admitting testimony—the arguments in support of those assignments are not delineated quite so clearly. Instead of organizing our discussion by assignment of error, we break mother's arguments into two issues: (1) testimony pertinent to R.P.'s brain injury, and (2) manifest weight of the evidence.

### A. Testimony pertinent to R.P.'s brain injury.

**{¶ 37}** Mother claims that R.P.'s allegations of abuse and neglect occurred after she suffered a traumatic brain injury, therefore, it was incumbent on LCCS to present expert medical testimony showing that R.P.'s allegations were not "fictitious" or "imaginary." She also argues that the trial court abused its discretion in allowing R.P.'s caseworker and counselor to testify that her brain injury did not impair her memory. There are a number of problems with mother's position.

**{¶ 38}** First, it is clear from the record that R.P. first made disclosures of abuse on October 25, 2016—*before* the November 7, 2016 car accident. Thus, it is not true that all of her allegations of abuse were made after she suffered a traumatic brain injury.

**{¶ 39}** Second, to the extent that mother claims that R.P.'s caseworker was permitted to provide opinions that R.P.'s brain injury did not affect her memory or

12.

cognition, our review of the record reveals that she rendered no such opinions.  She merely stated that mother "continues to blame the traumatic brain injury for these memories that [R.P.] is involving [sic]."

{¶ 40} Third, it was mother—not LCCS—who elicited testimony from R.P.'s counselor about the extent to which R.P.'s memory may have been impaired as a result of the accident.  On cross-examination, counsel for mother asked R.P.'s counselor:

Q:  Are you aware that [R.P.] was in a serious automobile accident?

A:  Yes, sir.

* * *

Q:  And are you aware of how her memory was impacted by the accident?

A:  I was not informed of or saw any reports that said her memory was impaired.

Q:  Did you see any exhibits that she exhibited confusion [sic]?

A:  No, not that I recall.

Q:  And that her communication skills were impaired?

A:  Not that I can recall.

Q:  And that remember concentration was impaired [sic]?

A:  Not that I can recall.

{¶ 41} Because of the suggestion from mother's attorney that R.P.'s allegations of abuse were not credible because of cognitive or memory impairment resulting from the

13.

auto accident, the GAL followed up on this line of questioning on cross-examination of R.P.'s counselor:

> Q: * * * Have you in your counseling sessions with [R.P.], does she exhibit confusion when she is disclosing at any point during your sessions [sic]?
>
> A: When she has disclosed the incidents that I reported, and even just talking about everyday things, I have never noted where she'll backtrack or have a confusing mix up or state a different story as opposed to what she had originally stated. So I have never noted any kind of confusion or – or memory lapse of any kind.

{¶ 42} We do not believe that the question posed by the GAL elicited expert medical opinions from R.P.'s counselor. But even if it did, under the invited error doctrine, a party may not take advantage of an error that he invited or induced the trial court to make. *Brock-Hadland v. Weeks*, 7th Dist. Mahoning No. 13 MA 170, 2015-Ohio-834, ¶ 6, quoting *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 313, 511 N.E.2d 106 (1987). Here, any purported error was invited when counsel posed questions to R.P.'s counselor that required her to relay her personal observations relating to R.P.'s cognition and memory. Mother, therefore, may not claim error in the trial court's failure to exclude the opinions of R.P.'s counselor. This is especially true given that mother did not seek exclusion of any such opinions at trial.

{¶ 43} Finally, mother has cited no authority requiring LCCS to affirmatively prove that R.P.'s allegations of abuse were not a product of the brain injury she sustained,

14.

especially given that LCCS witnesses did not perceive R.P.'s memory or cognition to be impaired. If mother believed that R.P.'s traumatic brain injury caused her to invent allegations of abuse, it was incumbent on mother—not LCCS—to present expert testimony to this effect. She failed to do so.

{¶ 44} Accordingly, we find that the trial court did not err in failing to exclude opinions from R.P.'s counselor, and LCCS was not required to present expert medical testimony as to the effect of R.P.'s brain injury on her cognition and memory.

### B. Manifest weight of the evidence.

{¶ 45} Mother claims that the trial court judgment is against the manifest weight of the evidence because (1) R.P.'s disclosures of abuse were not substantiated, (2) her disclosures were made after she suffered a traumatic brain injury, and (3) no medical evidence was presented to address the cognitive effects of the brain injury she sustained. Although not specifically assigned as error, mother also claims that the evidence showed that she had "turned a corner with her services," thus she should have been allowed more time to demonstrate that she is able to care for her daughter.

### 1. R.C. 2151.414.

{¶ 46} R.C. 2151.414 provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children's service agency. Under that statute, the court must first find by clear and convincing evidence that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists. Subsection (b) of that provision requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who

15.

are able to take permanent custody; and subsection (d) requires a finding that the child has been in the temporary custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 14-15.

{¶ 47} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43. But where the court finds that R.C. 2151.414(B)(1)(b), (c), or (d) applies, it need only find that it is in the child's best interest that permanent custody be awarded to the agency. *In re Johnathon A.*, 6th Dist. Lucas Nos. L-05-1314, L-05-1315, 2006-Ohio-2115, ¶ 55 ("If, however, the child has been in the custody of the agency for 12 or more months of a consecutive 22 month period, the court may grant permanent custody to the agency based only on a finding that it is in the best interests of the child.").

16.

**{¶ 48}** All of the court's findings under R.C. 2515.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L–03–1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

**{¶ 49}** We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.* 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While we review the evidence and consider witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

17.

## 2. The trial court's findings.

{¶ 50} The trial court found that R.C. 2151.414(B)(1)(d) applies—i.e., that R.P. has been in the temporary custody of LCCS for at least 12 of the past 22 months. Having made this finding, the court was required to determine only whether permanent custody with LCCS is in R.P.'s best interest. Although not required, the court also examined the R.C. 2151.414(E) factors. It found R.C. 2151.414(E)(1), (2), (4), and (16) to be applicable:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year

after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(16) Any other factor the court considers relevant.

{¶ 51} As to (E)(1), the court found that mother failed to complete case plan services, and only recently reengaged in treatment; failed to obtain housing; exhibited a lack of consistency in communicating with R.P.; demonstrated a lack of insight into R.P.'s allegations of abuse, claiming they were made up; missed urine screens; and failed to complete mental health treatment.

{¶ 52} As to (E)(2), the court found that mother had been diagnosed with PTSD and major depressive disorder; failed to complete services; was admitted to Flower Hospital's psychiatric floor; and had a long history with the agency.

{¶ 53} As to (E)(4), the court found that mother missed a number of visits; failed to remain in contact via telephone after her visits were suspended; and disappeared for "a period of months" during which she failed to keep in contact with the caseworker to ask about R.P.'s well-being and failed to contact R.P.

19.

{¶ 54} And as to (E)(16), the court found that mother's testimony was vague, inconsistent, and "full of excuses."

{¶ 55} The court then turned to the best-interest factors of R.C. 2151.414(D)(1):

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 56} The court found that permanent custody in favor of LCCS is in R.P.'s best interest because the case has been pending for almost two years; the child has special needs that are being addressed by her foster parents; the child is doing well in services; the child wants to be adopted by the foster family; the child is in need of a legally secure permanent placement and the award of permanent custody will facilitate an adoptive placement; and the GAL and caseworker agree that permanent custody is in the child's best interest.

20.

### 3. Mother's claims.

{¶ 57} In arguing that the trial court judgment is against the manifest weight of the evidence, mother claims that R.P.'s allegations of abuse were not substantiated and were made after she suffered a traumatic brain injury. She again suggests that medical testimony was required before her allegations could be relied upon. She insists that those allegations do not constitute clear and convincing evidence supporting the trial court's decision. Mother also maintains that she was making progress toward completing case plan services and should have been allowed additional time to complete those services.

{¶ 58} As we noted earlier, R.P. began disclosing incidents of abuse before her car accident, and we have already rejected mother's contention that LCCS was required to present expert testimony as to R.P.'s memory and cognition. As to the failure to substantiate R.P.'s allegations of abuse, we would observe that the concerns that led to R.P.'s removal from the home, LCCS's award of temporary custody, and the agency's motion for permanent custody extended well beyond those allegations of abuse. Mother's challenges do not suffice to establish that the trial court judgment was against the manifest weight of the evidence.

{¶ 59} Turning to mother's claim that she should have been given additional time to complete services, because the trial court found that R.P. had been in the temporary custody of LCCS for more than 12 of the last 22 months under R.C. 2151.414(B)(1)(d), it was not required to consider whether the child could be returned to mother within a reasonable time. Although the trial court did consider factors relevant to that inquiry, it

21.

was not required to do so. It could grant custody to LCCS if it found that it was in R.P.'s best interest to do so.

{¶ 60} Here, the trial court expressly considered each of the best-interest factors enumerated in R.C. 2151.414(D)(1), and determined that it was in R.P.'s best interest that permanent custody be awarded to LCCS. Given the child's expressed desire to remain with her foster family, the GAL's opinion consistent with those wishes, the amount of time the case has been pending, and the importance of continuing the progress that R.P. has made socially, educationally, emotionally, and medically, we cannot say that the trial court's findings were against the manifest weight of the evidence.

## III. Conclusion

{¶ 61} R.P.'s counselor did not provide improper opinion testimony as to the lack of effect of the child's injury on her memory, and LCCS was not required to present medical expert testimony to establish that the child's injury did not affect her memory and cognition. Additionally, the trial court's findings that the child had been in LCCS custody for more than 12 of the last 22 months and that permanent custody in favor of LCCS was in the child's best interest were not against the manifest weight of the evidence.

{¶ 62} Accordingly, we find A.B.-P.'s two assignments of error not well-taken, and we affirm the October 2, 2017 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating A.B.-P.'s parental rights and granting permanent custody to LCCS. A.B.-P. is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

22.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                                    JUDGE
James D. Jensen, J.

                                        _____
Christine E. Mayle, P.J.                                     JUDGE
CONCUR.

                                        _____
                                                                    JUDGE