**[Cite as *In re B.F.*, 2023-Ohio-4238.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re B.F.

Court of Appeals No.  OT-23-020

Trial Court No.  2021 JUV 101

**<u>DECISION AND JUDGMENT</u>**

Decided:  November 20, 2023

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Christopher N. Enoch, Assistant Prosecuting Attorney, for appellant.

Adam H. Houser, for appellee, D.F.

James E. Haughn II, for appellee, M.F.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, the Ottawa County Department of Job and Family

Services, appeals the June 23, 2023 judgment of the Ottawa County Court of Common

Pleas, Juvenile Division, denying its motion for permanent custody of B.F.  B.F.'s father,

M.F., and B.F.'s mother, D.F., have filed briefs on appeal. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} D.F. ("mother") and M.F. ("father") are the married, biological parents of B.F., who was born in February of 2021. Ottawa County Department of Job and Family Services ("the agency") became involved with the family after medical professionals at the hospital expressed concerns about whether mother could properly care for B.F. They reported that mother had not asked to see the child, did not respond to the baby's cries, was not bonding with the baby, and was not properly feeding the baby.

### A. The agency begins its investigation.

{¶ 3} An agency investigator met with mother. Mother admitted that she was overwhelmed, said that she was divorcing father, and asked the investigator if the agency could take custody of B.F. for the weekend so she could get some things in order. The investigator observed that mother lacked awareness of basic newborn care and did not know how to safely hold the baby. She felt that parents' house was not an appropriate home for the infant, there was an inadequate amount of formula and only one thin blanket for the infant, and mother intended to leave the infant with unsuitable caregivers. The investigator learned that this was mother's fifth child and she is not the primary caregiver for any of her children. Mother agreed to enter into an in-home safety plan with the agency.

2.

**B. B.F. is removed from his parents' custody.**

{¶ 4} Soon after entering into the in-home safety plan, mother became non-compliant. The agency, therefore, sought and was granted temporary emergency custody of B.F. B.F. was six days old. At the time of granting temporary emergency custody to the agency, the trial court found that the agency had made reasonable efforts to prevent B.F.'s removal from the home by (1) offering an in-home safety plan, (2) assisting with WIC sign up, obtaining food stamps, and finding suitable housing, and (3) expressing a willingness to work with the family in a community setting. The court appointed Joyce Plummer as counsel and guardian ad litem for the child. B.F. was placed with a foster family.

{¶ 5} The agency filed a complaint, alleging that B.F. was a neglected and dependent child. Following a shelter care hearing on March 2, 2021, the trial court issued a judgment entry that was substantially similar to the one it entered when it granted temporary emergency custody to the agency. The court appointed separate counsel for mother and father.

**C. B.F. is adjudicated a dependent child and a case plan is adopted.**

{¶ 6} Parents admitted the agency's allegation of dependency, the allegation of neglect was dismissed, and the trial court adjudicated B.F. a dependent child on April 2,

3.

2021. The court made the same reasonable-efforts finding that it made in its two previous judgments.

**{¶ 7}** A family case plan was filed with the court on April 8, 2021, and was approved by the court the next day. It set forth the same concerns articulated when the agency sought temporary emergency custody. It also alleged mental health concerns with respect to both parents. In particular, with respect to father, it alleged that he had difficulty controlling his temper. He purportedly yelled at the agency investigator during her initial home visit, refused to visit with her, refused to participate in an in-home safety plan, had an angry outburst at Joyful Connections (which resulted in his being told to leave the property), had an angry outburst at the doctor's office when he was told to wear a mask, and has had previous involvement with child protective services.

**{¶ 8}** The agency devised the following strategies for addressing its concerns with parents: (1) both parents will maintain monthly contact with the caseworker; (2) both parents will complete mental health and drug and alcohol assessments, be honest during the assessment, follow through with recommendations, and be successfully discharged from mental health programs; (3) both parents will complete parenting and budgeting classes and demonstrate newly-learned skills; (4) both parents will attend all scheduled visits with B.F.; (5) father will maintain sobriety and continue to attend AA meetings, and both parents will refrain from illegal substances or non-prescribed medications; (6) parents will maintain safe, clean, stable, hazard-free housing and allow the agency

4.

caseworker to photograph the house; (7) parents will seek and maintain financial stability; (8) parents will sign all necessary releases for the agency; (9) parents will submit to random drug screens; (10) parents will notify the agency of changes in employment, phone number, and address within 24 hours of any such change; (11) parents will remain law-abiding; and (12) mother will provide a copy of her social security card and driver's license. Parents were permitted two supervised visits per week with B.F. for two hours at Joyful Connections.

### D. The GAL files her first report and recommendation.

{¶ 9} The GAL filed her first report and recommendations on April 28, 2021. She noted that father has an associates degree in graphic design, is in counseling at Firelands Hospital, served six months in the army, is employed, has a driver's license, and has one domestic violence charge from 2004. She noted that mother is not employed, was homeschooled, had a difficult childhood, does not have a driver's license, and has four other children but does not have custody of any of them. The GAL remarked that father and baby had bonded, mother was trying hard, holds the baby, and speaks appropriately to the baby, and both parents were trying to make sure B.F. will have everything he needs at their home. She commented that the parents have an appropriate baby bed, bouncy chair, diapers, clothes, and formula at home, but they sleep on a mattress on the floor and have no other furniture. She recommended that boxes of belongings on the floor be

5.

moved upstairs and that parents obtain a baby gate to block the stairs. The GAL also expressed concern over the family's financial situation.

{¶ 10} Notwithstanding her concerns, the GAL recommended that B.F. be temporarily reunified with his parents so long as (1) the agency continues to provide protective services, (2) the agency helps parents find services in their area, (3) the safety plan continues, (4) Help Me Grow provides services, (5) parents take parenting classes recommended by the agency, and (6) the case is reviewed in three to six months.

{¶ 11} Despite the GAL's recommendation, the trial court entered a judgment on May 3, 2021, indicating that by agreement of the parties, B.F. would remain in the placement of the agency. Again, the court noted that reasonable efforts had been made to eliminate the need for continued placement with the agency based on the provision of the following services: (1) Help Me Grow, (2) home visits, (3) supervised visitation at the agency, (4) coordination of mental health services, and (5) Joyful Connections referral and services.

### E. Joyful Connections provides supervised visits for a year.

{¶ 12} Supervised visits between parents and B.F. took place at Joyful Connections. Joyful Connections filed periodic reports with the court advising the court of the number of visits that had occurred and how many had been canceled. For the most part, parents had been appearing for their scheduled visits, but some visits had been canceled due to the child's illness, parents' illness, covid exposure, or other obligations

6.

that interfered with the visitation schedule such as car problems, appliance deliveries, or deaths in the family. There were recurring problems with parents using foul language and their phones ringing during visits. Joyful Connections ultimately terminated visits because parents canceled six visits between February 1, 2022, to May 2, 2022. Supervised visits resumed at Village House beginning June, 2022.

**F. The agency files, and the court approves, periodic reports.**

{¶ 13} The agency filed periodic reports with the court. Its June 2, 2021 report indicated that mother had been compliant with case plan services; completed a mental health assessment and attended two out of three recommended individual counseling sessions; was attending weekly parenting educations classes with B.F.; was working nights and weekends; and completed an alcohol dependency assessment. It reported that father had been compliant with case plan services; completed a mental health assessment and has attended individual counseling sessions as scheduled; was attending weekly parenting educations classes with B.F.; was working a full-time job; and completed an alcohol dependency assessment. According to the report, parents were continuing to bond and become more affectionate with B.F. and were learning best practices for soothing him, but they would become overwhelmed easily when he was fussy or needed to be fed or changed.

{¶ 14} The report described that for the child to be reunified with parents, parents need to "successfully complete the objectives of their case plan," "demonstrate the

7.

learned skills," and "continue to be honest and forthcoming with [the] caseworker." It noted that B.F. was thriving in his current foster placement, his foster parents are attentive and meet his basic needs, they show affection and love for the child, and are engaged with Early Intervention due to B.F. having difficulty tracking movement and identifying faces and objects. The report summarized the "reasonable efforts" made by the agency to reunify the child or find a permanent placement.

{¶ 15} The agency's January 8, 2022 report recounted much of the same progress that had been reported in its previous updates, but explained some of the issues with the Joyful Connections visits. It also noted that mother had missed some counseling appointments, she had struggled to maintain a steady job, and parents needed to complete the budgeting class. A report filed the next month described an incident where parents became frustrated because B.F. would not cooperate with their plan for him to celebrate his first birthday with a smash cake.

{¶ 16} The agency's June 1, 2022 report noted the parents' new employment, acknowledged that parents had been attending counseling and completed their budgeting and parenting classes, reported that parents meet weekly with Help Me Grow, and alerted the court that visitation was now taking place at Village House. Again the report documented concerns with parents retaining information they learned in their classes. It described that parents bicker with each other, and in May of 2022, mother had thrown silverware at father. The report cited an incident where parents snapped at Village House

8.

staff because they were told their visits would be one hour instead of three hours. The report acknowledged that parents' house was now free of clutter, but complained that it needed to be cleaned and vacuumed before visits because B.F. once ate a piece of popcorn he found under the couch and the caseworker observed crumbs on the floor that had been there the previous week. An August 29, 2022 report expressed that safety issues had not been reduced to a sufficient level and that concerns remained about parents' ability to care for B.F. It remarked that visits had plateaued.

{¶ 17} The court approved and accepted the agency reports and made express findings that the agency had made reasonable efforts to prevent the continued removal of the child from the home. For the most part, parents did not object to the agency's reports. But of significance to the present appeal, on March 18, 2022, mother objected to a February 24, 2022 case report on the basis that the agency was "not making reasonable efforts to reunify the family" and because she had no input into the case plan. The court overruled her objection.

### G. The agency is granted an extension of temporary custody.

{¶ 18} On February 23, 2022, the agency moved for a six-month extension of temporary custody. It acknowledged that parents had made "appropriate progress on the various items included in their case plans," but it expressed continued concern over the parents' retention and utilization of the tools taught to them in their parenting classes and counseling sessions. It also raised the issues that had been reported by Joyful

9.

Connections, remarking that parents had exhibited "low frustration tolerance." And it complained that parents had failed to remedy a leak in their hot water heater.

{¶ 19} On March 26, 2022, the parties reached an agreement and the court granted the agency's motion for a six-month extension of temporary custody. The court noted that "[t]here is reasonable cause to believe that [B.F.] will be reunified with a parent or otherwise permanently placed during the period of the extension of temporary custody." The order contemplated that parents would visit with B.F. once weekly for three hours at Joyful Connections and once weekly for one to one-and-a-half hours in their home, supervised by the caseworker.

### H. Dr. David Connell conducts parenting assessments.

{¶ 20} On March 30, 2022, the GAL asked the court to order parents to submit to a parenting assessment by Dr. David Connell. The court granted the motion. Counsel for mother requested additional discovery, including Dr. Connell's CV. Dr. Connell interviewed parents in June of 2022, and issued a report on August 28, 2022.

{¶ 21} As to mother, Dr. Connell administered the Minnesota Multiphasic Personality Inventory-Reformatted Version ("MMPI") test and an IQ test and found that she met the diagnostic criteria for intellectual disability. He opined that this disability affected her functional capabilities and her ability to take in new information, process it, and act on it in a healthy, rational way. Dr. Connell expressed that mother's intellectual disability may play a role in her failure to understand why she does not have custody of

10.

any of her five children. Mother told Dr. Connell: "I don't know what the problem is. I took him home from the hospital and they expected me to set up, but I wasn't fast enough for them."

{¶ 22} Dr. Connell reported that mother's MMPI was of questionable validity because it indicated severe problems that mother had not conveyed when he interviewed her. Mother's responses suggested somatic, cognitive, emotional, thought, and behavioral dysfunction, included complaints of poor health, head pain, neurological symptoms, and gastrointestinal problems, and reflected admissions of juvenile conduct problems and possible hyperactivity or mania.

{¶ 23} In his report, Dr. Connell recited information provided by mother concerning her other children. Her first child was the product of a rape that occurred when she was 16 or 17 and the child is in her mother's custody. Her second child is in his father's custody and she does not have a relationship with the child because the child's father would not allow it. She conceived her third child in Texas during a two-year relationship, but the child's father has custody of the child; mother did not know why she lost custody of her. She conceived her fourth child with a man she described as her best friend.

{¶ 24} Mother told Dr. Connell that she met father in 2019, while she was working at Cedar Point, and they married six weeks later. She described their marriage as "happy right now" and said that her pregnancy was planned. Mother said that she "wasn't

11.

allowed to take [B.F.] home, so [she] took him to a friend's house"—she doesn't remember why. She claimed that "[i]n every case they took [her] child they never told [her] what was wrong."

{¶ 25} Dr. Connell concluded that mother could not raise a child without constant supervision and assistance and she does not have the intellectual or emotional capacity for custody of a child. He did not recommend returning custody of B.F. to mother.

{¶ 26} As to father, Dr. Connell administered the MMPI, and as with mother, believed the results to have been of questionable validity. Father presented himself in a very positive light and denied many faults and problems that most people admit to. His responses also suggested dysfunctional thinking, feelings of persecution, aberrant perceptions and thoughts, delusions reflecting a belief in thought-broadcasting and mind reading, psychosis in the form of delusions, impaired reality, and hyperactivity and mania. He also reported symptoms of anxiety, depression, and head pain.

{¶ 27} Father told Dr. Connell that he had not been vaccinated for Covid-19 because the vaccines were too rushed. He had been hospitalized for Covid-19, but he believed that Covid was weaponized in a lab in China and the epidemic had been planned. Father said that he did not know why B.F. had been removed from their custody. He claimed that no one had told him and that he had been excluded from discussions with the agency. Father told Dr. Connell that he had a daughter with a

12.

woman he dated for two years and that he had given up parental rights of his daughter "so [her mother] would lose custody."

{¶ 28} Father described his relationship with mother as loving and healthy, but he denied that B.F. was planned. He said that mother had mentioned wanting kids, but he knew that she had lost custody of four children, so he had concerns. Father told Dr. Connell that the police had been called a couple of times because of his PTSD, that some days he doesn't know what he's doing, mother is afraid of him because of his PTSD, and he has blackouts where he does not remember what he has done.

{¶ 29} Dr. Connell concluded that although father did not present with intellectual deficits, his personality testing and refusal to talk about past traumas suggested an inability or disinterest in becoming a functional parent. He opined that father either has a severe personality disorder or was "faking bad" on the MMPI. Dr. Connell did not recommend that father be given custody of B.F., whether father is single or remained married to mother.

## I. The GAL files a new report and recommendation.

{¶ 30} The GAL filed a new report and recommendation on September 1, 2022. It described that B.F. had been diagnosed with reactive airway disease, "has delays in receptive communication, expressive communication, and fine motor skills," and when B.F. gets frustrated, he "screams, shrieks, and bangs his head." The report indicated that parents have a difficult time calming the child. The report also stated that Dr. Connell

13.

completed the parenting evaluation in August of 2022, and shared concerns that parents do not have the ability to parent B.F.

{¶ 31} According to the GAL's report, parents had made "some but little progress on their case plan," Joyful Connections terminated visitation due to parents' behavior and no-shows, parents get overwhelmed easily, parents do not have the ability to address the child's special needs, father had been argumentative with doctors, there were concerns about how much information about the child's needs that parents comprehend and remember, and there were concerns about parents' ability to follow through with doctors' recommendations for treatment at home. The GAL opined that it would be best if B.F. was placed in a home where parents could still visit and be part of his life, but she stated that B.F. is thriving in his current placement, he sees his foster parents as a source of comfort and reassurance, the foster parents are doing an exceptional job of meeting his needs and providing love and nurturing, and B.F. will need special education and will continue to need to see medical specialists in the future.

{¶ 32} The GAL acknowledged that parents love the child very much and have been very cooperative with the GAL, but she recommended that B.F. remain in his current placement, that the agency seek permanent custody, that parents continue to address their mental health issues, and that parents be permitted to continue visits with the child.

{¶ 33} The GAL filed a substantially similar report and recommendation on

14.

April 10, 2023.

### J. The agency moves for permanent custody.

{¶ 34} On November 9, 2022, the agency moved for permanent custody under R.C. 2151.414(B)(1)(d) and 2151.414(E). It alleged that B.F. had been in the custody of the agency for more than 12 months of a consecutive 22-month period and that custody in favor of the agency was in B.F.'s best interest. Although unnecessary where permanent custody is sought under R.C. 2151.414(B)(1)(d), the agency argued that B.F. cannot be placed with either parent within a reasonable amount of time, B.F. should not be placed with either parent, and "particular factors included in 2151.414(E)(1) through (16) are satisfied"—specifically R.C. 2151.414(E)(1) and (2).

### K. The case is tried.

{¶ 35} After some delays due, in part, to mother's health issues, the matter was tried on April 11, 12, 13, and 18, 2023. Numerous witnesses testified, including the GAL; Tami Matthews, of Joyful Connections; Toni Johnson, of the Ottawa County Board of Developmental Disabilities; Jocelyn Foote, B.F.'s caseworker; J.H.F., one of B.F.'s foster mothers; Dr. Connell; Megan Rohde, B.F's early interventionist; Susan Fuller, of Village House; and father. The parties briefed closing arguments.

### 1. The GAL

15.

{¶ 36} Joyce Plummer has been B.F.'s GAL since the beginning of the case. She described that he was removed from the home because of lack of bonding with his mother and other behaviors at the hospital. In her view, the current issues preventing B.F. from being returned are whether parents have an adequate home and whether they can provide adequate care for his special needs. She also described that B.F. has severe delays in expressive and receptive communication and fine motor skills and he has sensory problems. He bangs his head, he may have hearing issues, and he had a hospital stay for breathing problems. The GAL mentioned concern over the fact that parents have nine cats. She claimed there have been times when B.F. has been fussy and parents admitted that they did not know what to do. She believes that parents have their own mental health issues that interfere with their ability to care for B.F. and do not understand all his needs.

{¶ 37} The GAL described that father has anger issues and trouble understanding everything that needs to be done to care for B.F.; she has observed father become defensive and argumentative with one of B.F.'s doctors. The GAL said mother has cognitive and intellectual disabilities, tends to panic, and gets upset easily. Mother has four other children, none of whom are in her custody, and father has a daughter who is not in his custody. The GAL claimed that because father has to work, he cannot take off all the time required to take B.F. to the doctor, and mother does not have a driver's license. She said Early Intervention gives foster parents things to work on with B.F.

16.

every day, and she does not think parents could do that. She believes father could respond to an emergency, but was skeptical that mother could.

{¶ 38} The GAL has interacted with the foster parents and has observed how they interact with Early Intervention. Their home is appropriate, they play with B.F., work with him, take him to his medical appointments, and work hard 24/7 to meet his special needs. The foster parents have been given extensive lists of things to do with B.F. When B.F. bangs his head, the foster parents redirect him, but they try to catch it before it starts. The GAL said that B.F. is happy, secure, and bonded with his foster parents. She said that the foster parents "are the only parents that [B.F.] knows." She described their interaction with B.F. as "perfect." On cross-examination, however, the GAL acknowledged that she has only seen B.F. with the foster parents three times.

{¶ 39} The GAL acknowledged that B.F. knows parents, but claims that he has not put together the relationship. She said that parents have made limited progress on their case plan. They have done what has been asked of them and have been communicative with her, but mother is still panicky and gets upset easily. Mother has said that she does not think she can take care of B.F. Parents have taken parenting classes, but haven't implemented what they have learned. She said they pass B.F. back and forth. The GAL described their visitation as sporadic and noted that Joyful Connections terminated their visitation for missing visits; she agreed, however, that parents had missed only five of 28 visits in February, March, and April of 2022, and it was these missed visits that led Joyful

17.

Connections to terminate services. She acknowledged that there were legitimate issues that prevented parents from attending every scheduled visitation. She also acknowledged that she has not seen parents with B.F. since he was very little. The GAL admitted, in fact, that other than one visit at Village House the Friday during trial, she had not seen parents with B.F. since they left Joyful Connections—approximately 11 months before trial. Moreover, parents now live in Michigan, and the GAL has not been to their house.

{¶ 40} On cross-examination, the GAL conceded that parents had not been included in the Individualized Family Services Plan ("IFSP") that was created for B.F. by the Ottawa County Board of Developmental Disabilities. It was her understanding that the caseworker was telling the parents what they needed to know. She denied that it was her responsibility to suggest that parents be involved with Early Intervention and said that it's not common practice for parents to be there. The GAL never recommended that mother herself be referred to Ottawa County Board of Developmental Disabilities or that parents take a class specifically for parenting a special needs child.

{¶ 41} A video from one of parents' visits at Village House was played in court. The GAL had never seen video footage of parents interacting with B.F. She acknowledged that in the video, parents responded appropriately to the child's head-banging. She agreed that parents made some progress in parenting.

{¶ 42} Even though she had not seen the Michigan home, the GAL remains concerned about parents' housing and their ability to care for B.F.'s medical needs. She

18.

is also concerned that mother does not have a driver's license, but has driven without her license. She opined that it is in B.F.'s best interest "to remain where he is and custody to the current foster parents." She said that "[h]e should have permanency with the current foster parents because they're * * * his parents." She recognized that parents love B.F. and said that she would like to see them still have contact with their son. She agreed that father could avail himself of the services provided by the state if he is awarded custody, but she does not believe that it is logistically possible for mother to have only supervised visits if father is awarded custody.

### 2. Tami Matthews

{¶ 43} Tami Matthews was the executive director of Joyful Connections, where supervised visits took place between B.F. and parents for over a year. Parents did not progress beyond Level 1, which is entirely supervised by a monitor who sits at the edge of the room and records all actions and words. Joyful Connections' records were admitted into evidence.

{¶ 44} Parents were warned several times not to use foul language during visits. Mother was reminded to properly wear a mask. The parents' visits were terminated for excessive canceling of visits. Matthews conceded that some of parents' cancellations were beyond their control. She agreed that parents attended the majority of their scheduled visits.

19.

**{¶ 45}** As far as Matthews knows, during visits, mother picked B.F. up, cuddled with him, played with toys with him, and properly fed and changed him. She is not aware that head-banging behaviors had ever taken place at the visits.

### 3. Toni Johnson

**{¶ 46}** Toni Johnson is B.F.'s service coordinator at the Ottawa County Board of Developmental Disabilities. She was involved in creating his IFSP. She described that IFSPs are prepared with the family and are reviewed either periodically or annually. She said they "invite everyone" to evaluations. "Whoever's involved with the child, we invite them to the meetings."

### 4. Jocelyn Foote

**{¶ 47}** Foote is B.F.'s current caseworker. She testified that B.F. has breathing issues, problems with food intake, sensory-processing problems, a lazy eye, and speech delays, bangs his head when he is frustrated or overwhelmed, and may have problems hearing. He sees a pulmonologist. He has also been referred to Early Intervention and has had speech, occupational, and physical therapy. Early Intervention regularly meets with B.F. and his foster parents and demonstrates various activities to assist B.F.

**{¶ 48}** Foote described the case plan requirements, which had been created by her predecessor. The parenting class and mental health assessments were among the most important parts of that plan. Foote emphasized that parents were expected not only to complete the classes required by the case plan, but to implement the skills they learned.

20.

She believes that the case plan requirements were tailored to address the problems that led to the child's removal from the home.

{¶ 49} Foote testified that there initially was a problem with mother canceling appointments, but parents completed the required mental health assessments and parenting classes. When she supervised visits between parents and B.F., she sometimes had to step in to assist with potential choking hazards. Parents had problems calming B.F. and often overwhelmed him. Foote described the smash cake incident that was described in the agency's report to the court. Parents also were defensive about B.F.'s head-banging and had a hard time understanding that it wasn't anyone's fault. It took awhile for parents to recognize B.F.'s head-banging behavior and how to redirect and manage the situation.

{¶ 50} Parents had visits at the agency every Wednesday with Help Me Grow and initially had visits at Joyful Connections. Visits at Joyful Connections terminated, so Foote supervised visits at the agency and some in-home visits. Foote testified that parents had cats in the home and sometimes paid more attention to the cats than to B.F. Their house was cluttered and sometimes unsanitary. It needed to be vacuumed. At first, there were medications and alcohol sitting out, but this was eventually remedied. Wood for the stove needed to be put away.

{¶ 51} Foote acknowledged that father maintained full-time employment throughout the duration of the case. Mother had a harder time keeping jobs and job-

21.

hopped a lot and did not have her driver's license. Although they took budgeting classes, Foote was critical of some of parents' spending decisions. She did not see much difference in parents' interaction with B.F. after taking parenting classes. She does not believe that parents fully understand B.F.'s needs.

{¶ 52} B.F. has been with the same foster parents since he was removed from parents' custody. Early Intervention meets with them regularly at their home and they make sure he goes to all his doctors' appointments. They advocate for him well. Foote believes that parents are aware of B.F.'s appointments because they have been to some appointments and could hear when the next appointments were scheduled. She has told them of appointment dates when they ask. Nevertheless, parents have not attended every medical appointment. She denied that parents have been excluded from appointments.

{¶ 53} In Foote's view, B.F.'s foster parents are more attentive to B.F., ensure that their home is hazard-free, and take action to prevent his head-banging. He has his own room at the foster parents' house and the home is safe and appropriate.

{¶ 54} Early Intervention has worked on B.F.'s fine and gross motor skills and have made referrals. The early interventionist sends her email updates. Foote acknowledged that Early Intervention has not met with parents, but she claims that she tells parents about activities that they recommend for B.F. Parents received a copy of his sensory profile.

22.

{¶ 55} Foote is concerned that parents do not fully understand B.F.'s special needs and may not be able to monitor and go to all his appointments. She is concerned that they have not incorporated skills from their parenting classes, that they won't control his head-banging, that their house is not appropriate, and that their cats may affect B.F.'s breathing. Foote believes that parents catastrophize and become overwhelmed and may not be able to handle a medical emergency. She believes that permanent custody in favor of the agency is in B.F.'s best interest. The next step would be to look for adoptive parents; his foster parents are licensed to adopt. Foote does not believe that reunification with parents is possible.

{¶ 56} Foote discussed the "reasonable efforts" that have been made to facilitate reunification, including (1) anger management treatment, (2) mental health referrals, (3) helping provide information to landlords, (4) financial assistance like gas cards and Walmart gift cards, (5) referrals to various agencies, (6) supervised visits, (7) home studies, and (8) budgeting classes.

{¶ 57} On cross-examination, Foote acknowledged that parents have always lived in a home, have food, and have a vehicle. She does not know if they currently pay rent. The parents have never been provided a copy of B.F.'s IFSP devised by the Developmental Disability Board to address B.F.'s special needs, although Foote claimed that she provided updates. She agreed that it would be helpful if parents had a copy of that plan and that it would have provided them a greater understanding of B.F.'s needs.

23.

Foote never referred mother to the Developmental Disability Board to evaluate her intellectual disability.

{¶ 58} Foote acknowledged that mother has had her own medical issues and has been able to seek care, make appointments, and search out specialized care, including emergency care when she started bleeding due to complications from surgery. She believes that B.F.'s inability to communicate his needs may prevent mother from handling a medical emergency that may arise with him. Mother informed Foote that she has spoken to daycare providers and has B.F. on a waitlist. She agreed that she could make referrals to Early Intervention in Michigan if B.F. was returned to his parents.

{¶ 59} Foote is aware that Village House performs video monitoring of visits, but she has not reviewed any footage. She has not observed any visits at Village House even though parents have been going there since June of 2022.

{¶ 60} Foote confirmed that father has been compliant with case plan services, but she insists that parents have not shown that they can implement what they've learned. She is not aware of any additional services that father needs. Foote said that father and B.F. have a better bond than mother and B.F. B.F. tends to go to father to be picked up or if he is upset. Father does "pretty well" feeding, changing, and holding B.F. She said that if father was on his own, there would be a better chance of reunification in the long-term. She would still have concerns with father's ability to respond to an emergency

24.

because B.F. cannot verbalize what he is experiencing. Foote is aware that parents have a crib and a car seat and have looked into primary care physicians in Michigan.

{¶ 61} On redirect, Foote testified that parents did not implement what they learned in budgeting class and parenting class, did not attend all scheduled visits, have not remained law-abiding,[1] and have not maintained a safe and hazard-free home. She denied that parents asked for additional services for mother through the Developmental Disability Board.

### 5. J.H.F.

{¶ 62} J.H.F. is one of B.F.'s foster mothers. B.F. was six days old when he came into the care of J.H.F. and her wife. They are very bonded with him. She described their home and B.F.'s daily routines. B.F. goes to an in-home babysitter from 8:00 to 4:00. J.H.F. said that B.F. is energetic and independent, but needs to be constantly watched because of his head-banging behaviors. His foster parents know his triggers. He is easily frustrated.

{¶ 63} J.H.F. explained B.F.'s delays—fine and gross motor skills and receptive and expressive communication. B.F. had a hospital admission in April of 2022. J.H.F. testified that they work with B.F.'s primary doctor, OT, PT, and speech therapy,

---

[1] No details were provided concerning this allegation, except perhaps that Foote and the GAL believe that mother has driven without a license.

25.

pulmonologist, and Early Intervention. They have implemented techniques learned through Early Intervention and she and her wife feel they have been well-coached.

{¶ 64} J.H.F. has seen parents interact with B.F., but only at B.F.'s doctor appointments. They seemed overwhelmed and passed him back and forth. They also argue with each other. J.H.F. believes that B.F. feeds off others' emotions. Parents have not been to any medical appointments since June of 2022. She made a list of appointments and notated which ones they have attended or not attended. She claimed that parents were either present when the appointments were scheduled or were told about them. She also claimed that B.F. is tense, fussy, or won't nap after visits with parents.

{¶ 65} J.H.F. believes permanent custody should be granted to the agency. She is concerned about his safety and about him getting to all his appointments. She and her wife would like to adopt him.

### 6. Dr. Connell

{¶ 66} Dr. Connell is a psychologist. The parties' stipulated to his expertise in clinical psychology. He went over his CV. He explained that he believes that an opinion about a parent's fitness can be the product of scientific knowledge and methods. He said that theories underlying a parenting evaluation have been tested in the scientific community and subject to peer review. He has done 200 parenting evaluations. He

26.

conceded that he had not been to any seminars specific to parenting or custody evaluations. He stopped updating his CV in 2014.

{¶ 67} Despite stipulating to his expertise, mother's counsel asked that he be excluded as an expert because he failed to provide a current CV and because he lacks specialized training in conducting parenting evaluations. The court denied the motion.

{¶ 68} Dr. Connell testified on direct concerning the steps involved in conducting a parenting evaluation. He said that he meets with the caseworker or referring attorney, gathers available documentation, reviews criminal history and previous psychological evaluations, meets with the parents together and individually, administers psychological or intelligence testing, then compiles all these elements to make a recommendation.

{¶ 69} Here, Dr. Connell reviewed the case notes from the agency and visitation notes from visitation monitors, and interviewed parents jointly and separately. He asked about their childhoods and family histories, educational histories, medical and psychological histories, juvenile history, employment history, relationship history, and criminal and substance abuse history. Dr. Connell described mother as cooperative during the process; father "seemed" cooperative, "but he really didn't tell [him] much" and there were some issues he would not talk about.

{¶ 70} Father told Dr. Connell that he has had blackouts that scared his wife, which he attributed to PTSD. Because father did not talk much about his PTSD, Dr. Connell did not have the background necessary to understand whether the diagnosis was

27.

legitimate. He also would not talk about episodes of blackouts. Father would not say much about his daughter from a previous relationship, who had been removed from his and the mother's custody. He told Dr. Connell that he relinquished custody of his daughter to prevent his daughter's mother from having custody. This did not make sense to Dr. Connell. Mother had four children removed from her custody and maintains relationships with none of them. She did not understand why she had lost custody. Both parents said that they did not really understand the issues preventing them from having custody of B.F.

{¶ 71} Dr. Connell administered the Slosson IQ test and MMPI to mother. Mother has severe cognitive impairment and difficulty in reasoning, problem-solving, and comprehension. He would not expect someone with her IQ to be able to parent independently. Some of mother's answers on the MMPI were extreme to the point of being invalid. The responses indicated abnormal emotional, cognitive, behavioral, and social functioning.

{¶ 72} Father's MMPI results were also very extreme, indicative of problems related to his emotions, cognition, socialization, and how he perceives the world around him. He described father's results as "[f]ar more pathological than the 99 percent of other people who took the test who were involved in custody evaluations." Dr. Connell did not test father's IQ because father presented as an intelligent man who is "articulate and reasonable and rational."

28.

{¶ 73} Ultimately, Dr. Connell concluded that neither parent "is capable of good enough parenting for [B.F.] either separately or together." Mother lacks knowledge and conceptual ability and problem-solving necessary to understand what is needed to raise a child. Father's performance during the interview was "not all that cooperative," Dr. Connell assumed there was a reason father was not making a good-faith effort, and he believed that it was probably because father "was ambivalent to that returning of his son." He said that father did not have much to do with parenting B.F.

{¶ 74} Dr. Connell opined that if B.F. was returned to his parents, he would not get "stability, stimulation, nutrition, safety, understanding of development, understanding of the child's development and how that would affect their—his growth and health." This opinion did not take into account B.F.'s special needs because some of his diagnoses came after Dr. Connell performed his evaluation. Dr. Connell does not believe that it would work for only father to be awarded custody. He believes this would require him to reevaluate father individually "to determine whether individually by himself he has the knowledge, ability, emotional stability and interest ability" to raise B.F. alone. He said that this could not be determined based on the already-performed evaluation. Dr. Connell opined that it is in B.F.'s best interest to be adopted by a family or the foster parents or placed for adoption in an appropriate home.

{¶ 75} On cross-examination, Dr. Connell acknowledged that he did not see mother interact with B.F. and never attended visitation. He conceded that it would

29.

typically be standard practice to observe interaction with the child. He did not review records from Village House. Dr. Connell conceded that with mother's IQ, she has a reading level between fourth and sixth grade, yet the MMPI was administered to her on paper, potentially above her reading comprehension, so he cannot say how accurate the MMPI results were. He admitted that if he had performed the IQ test first, he probably would not have administered the MMPI due to her reading level.

{¶ 76} Dr. Connell agreed that mother could probably feed B.F. with assistance and oversight and may be able to identify the need for medical care. She could bathe and clothe the child and buy food at the grocery store. He does not think it would be a workable plan for mother to have 24/7 supervision with the child. He never suggested to mother or the caseworkers that mother should reach out to the county Developmental Disability Board. He does not believe that it would be beneficial to reevaluate mother.

{¶ 77} Dr. Connell provided further details about father's MMPI results. He does not believe that father was honest and forthright in his responses. He agreed that the test questions are subject to interpretation. He did not ask father when he last experienced a black out. Dr. Connell denied that distancing and masking requirements rendered his interview with father abnormal. He agreed that if a patient is anxious, it could elevate the results. He allowed for the possibility that father was "faking bad" on the MMPI.

30.

**{¶ 78}** The court asked Dr. Connell the difference between a parenting and a custody evaluation. Dr. Connell responded that from his perspective, there was no difference.

### 7. Megan Rohde

**{¶ 79}** Megan Rohde is B.F.'s developmental specialist for Early Intervention at the Ottawa County Board of Developmental Disabilities. She is responsible for implementing direct services as a primary service provider. There were initially vision, hearing, and feeding concerns with B.F., but there are also fine and gross motor, speech, sensory processing, receptive communication, expressive communication, and behavioral concerns. She went into the home of the foster parents and worked on strategies. She has met with them at least monthly for the past two years.

**{¶ 80}** Rohde teaches the foster parents strategies and makes recommendations based on B.F.'s daily routines, and she works one-on-one with B.F. She has worked hundreds of hours with B.F. They have used "baby sign language" with B.F. to assist him with expressive communication. She was involved with B.F.'s IFSP, along with B.F.'s case manager, the foster parents, the GAL, and the service coordinator. After each home visit, she does a home visiting team plan, which she emails to the foster parents, the GAL, and the caseworker so they know what they're working on and can be kept up to date. At the first IFSP meeting and several times thereafter, she asked the caseworker

31.

and the GAL to let her know when the reunification plan was moving forward so that parents could be involved. She was told they were not ready.

{¶ 81} Rohde went over B.F.'s progress and delays. She talked specifically about his head-banging. It developed at around six months old and could be sensory-seeking behavior, a behavior manifested out of frustration, or there could be an underlying medical reason for it. She believes it is sensory-seeking behavior. There are associated safety concerns with head-banging. He has a soft helmet to protect his head and the rails of his crib are padded. He needs to be watched carefully all the time. The foster parents are good about reading his cues and applying strategies to redirect him.

{¶ 82} B.F. has a developmental pediatrician, is doing OT, PT, and speech therapy, and they are looking at genetic components for his delays and behaviors. Rohde wants testing for fetal alcohol syndrome disorder because B.F. is showing some signs of it.

{¶ 83} Whoever is B.F.'s caregiver going forward will have to follow through with home techniques, outpatient therapies, Early Intervention, then school services. When she works with families, she shows them techniques and practices it with them.

{¶ 84} On cross-examination, it was emphasized that Rohde met with and shared the coaching and strategies with only the caseworker, foster agency caseworker, and GAL, but not with parents. She has never observed parents' interaction with B.F. and has never provided coaching services to the parents. Rohde agreed that it would have been

32.

beneficial for parents to have worked with Early Intervention. She works with biological parents when the caseworker and GAL feel it's appropriate.

### 8. Susan Fuller

{¶ 85} Fuller is the executive director of Village House. Parents have visited with B.F. there since June of 2022. They were initially at Level 1 supervision, requiring the most amount of supervision, but changed to Level 2 in November of 2022. A staff member need not be in the room for Level 2 visits. Audio and video recording is used at Village House regardless of the level of supervision. A flash drive of a visit was entered into evidence and portions were played.

{¶ 86} It appeared to Fuller that parents have bonded with B.F. B.F. gravitates to father and likes to pat his belly. He likes to be held, and when he doesn't feel well, he wants to cuddle with father. Parents typically bring fast food for B.F. to eat. Sometimes they read to him. Parents respond appropriately if B.F. falls or bumps his head or puts too much food in his mouth at once. Fuller has never felt that B.F. did not want to see parents. Parents generally make all of their visits, but February was difficult because mother had multiple surgeries. Fuller has no concerns about the visits that have taken place at Village House.

33.

{¶ 87} It was apparent to Fuller that B.F. has some delays, but she has never been informed about those delays. It would have been helpful to know so that the facility could be better-prepared for his visits. Fuller is aware of B.F.'s head-banging. Usually mother will tell father to pick B.F. up when he starts to do it. They try to get to him as quickly as possible and often have a sense of when he might do it. Oftentimes, being told "no" is a precursor to the head-banging behavior.

{¶ 88} The GAL observed visitation the week before Fuller testified, but otherwise has not observed any visits since parents began at Village House in June of 2022. Village House encourages caseworkers to observe visits, but Foote has never been there.

### 9. Father

{¶ 89} Father has three children, ages 19, 16, and two-year-old, B.F. He has been married to mother for four years. He was not present for B.F.'s birth because he was not vaccinated, so the hospital wouldn't allow him to be there. After leaving the hospital, B.F. went to mother's friend's house, then he went into the agency's custody. B.F. has never spent the night at parents' home.

{¶ 90} Help Me Grow did visits with parents and B.F. at their home and helped teach them how to parent him. They provided handouts that were helpful. Father described himself as a hands-on learner.

{¶ 91} Parents were not included in Early Intervention appointments. Father just learned of those appointments during the trial; he did not know they were occurring. He

34.

would have liked to have been involved so he could better understand his son, his special needs, and his reactive airway disease. He would have liked to have known more about B.F.'s sensory issues. Parents just recently learned that B.F. was using baby sign language. Parents didn't know that he was signing; his wife "cracked the code" and figured out that he was telling them that he wanted more, for instance.

{¶ 92} Father also would have liked to have known more about B.F.'s head-banging. He notices that B.F. does it when parents tell him "no." Now, they get to him as soon as he gets down to do it, and they redirect him. They were not formally instructed how to react. Neither the caseworker nor Early Intervention ever gave them the exercises they were doing with B.F.

{¶ 93} Father understands that B.F. needs to treat with a pulmonologist, but doesn't have an understanding of his current breathing issues. He believes that information was intentionally withheld from parents. He denied that he had been angry or belligerent with medical professionals. He denied that there was no food in the house, that the house was unsuitable, or that they were financially unstable when B.F. was born.

{¶ 94} Parents now live in Royal Oak, Michigan. Their landlord in Ohio decided to sell the house they lived in before, and the house in Michigan was all they could find. They have two housemates and pay rent of $700 per month. Parents want to find a home for just father, mother, and child. The GAL has never visited the home in Michigan.

35.

{¶ 95} Despite being in Michigan, they still come to see their son every Friday. They have a crib for B.F. at their home, but after listening to foster mother's testimony, they intend to add padding. They have a car seat installed. Father went to the Port Clinton Fire Department to learn how to install it.

{¶ 96} Father was in the army but was discharged because he had smoker's lung from second-hand smoke and was unable to run. He testified that his drill sergeant hit him in the back of the head for picking up the wrong rifle during a drill and he has PTSD from that experience. He said that he has blacked out one time, approximately 20 years ago. He also testified that he was sexually abused as a child. He turned to alcohol for a while, but has been sober since 2002. He goes to counseling at Firelands.

{¶ 97} Father has a full-time job. His boss is receptive to accommodating his schedule when B.F. comes to live with them. Parents also have daycare arranged for B.F. in Michigan and father recently received health-insurance information from his employer. Mother has an appointment with the Department of Human Services to talk about a back-up plan for insurance. Father said they have people who can help them in Michigan and supervise mother while she is with B.F. He believes that with supervision, mother can care for B.F.

{¶ 98} Mother recently had a medical issue. She had a hysterectomy, but experienced complications two weeks later. An artery burst and she started bleeding. He

called a friend who was five minutes away and they quickly drove her to the hospital. It was quicker than calling an ambulance.

{¶ 99} Father testified that the cancellations at Joyful Connections were beyond his control. He denied that he was not forthcoming with Dr. Connell. He acknowledged that mother does not have her driver's license. And he denied that he and mother are separating from one another.

**L. The court denies the agency's motion and awards custody to father.**

{¶ 100} On June 23, 2023, the trial court denied the motion for permanent custody. It found that B.F. has been in the custody of the agency for 12 or more months of a consecutive 22-month period. It specifically found that R.C. 2151.414(E) did not apply because where a child has been in the temporary custody of a child's service agency for 12 or more months of a 22-month period, the only other consideration is the best interest of the child. The court concluded that it could not make best interest findings here because "the credible evidence does not place the parents in a fair or honest position to do so."

{¶ 101} Despite stating that it could not make best-interest findings, the court, citing R.C. 2151.414(D)(1)(a), recognized that B.F. has developed "a loving, safe, healthy and supportive relationship with his foster parents," "[h]e lives in a safe and suitable environment," and "his service providers have given wonderful care to him and his foster family." But, the court observed, M.F. has also formed a bond with B.F. and

37.

"there is not credible and reliable evidence that [B.F.] has been afforded sufficient opportunities through diligent efforts of OCJFS to develop meaningful interactions and interrelationship with his parents." Citing R.C. 2151.414(D)(1)(b), the court noted that B.F. is only two, so no in camera interview had taken place, but it stated that it had considered the GAL's recommendations. Citing R.C. 2151.414(D)(1)(c), the court acknowledged that B.F. had been in agency custody for more than 12 of the past 22 months. Citing R.C. 2151.414(D)(1)(d), it found that there is not credible and reliable evidence that B.F.'s need for a legally secure placement cannot be achieved without a grant of permanent custody to the agency. And citing R.C. 2151.414(D)(1)(e), it found that no factors listed in R.C. 2151.414(E)(7) to (11) apply.

{¶ 102} The court stated that its review under R.C. 2151.414(D)(1)(a)-(e) permitted it to consider the agency's efforts to reunify the family. It explained that "[u]nless the agency has been relieved of its statutory obligation to use reasonable efforts to facilitate reunification, it must demonstrate such efforts at the permanent custody hearing, if it has not established that it made reasonable efforts prior to the hearing on the motion." It described "reasonable efforts" as an "honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." It found that the agency had not been relieved of its statutory responsibilities to engage in reasonable and diligent efforts to facilitate reunification here. It concluded that the services provided to parents—especially mother—were not tailored to effect the purposes of changing

38.

parental conduct so as to reasonably expect parents to remedy the circumstances prompting the removal of B.F. from their home. The court remarked that the agency should have known in the early stages of the case that to reunify B.F. with his parents, it would need to address parents' intellectual disabilities, cognitive behavioral concerns, and parenting skills that were of concern to the agency.

{¶ 103} The court found that parents complied with case plan services, but the agency complained that parents did not sufficiently understand and demonstrate the ability to apply the skills they learned which are necessary to safely parent B.F. It determined that only "typical and normal" case plan services had been provided, and the agency should have known that parents would not succeed with only standard case plan services. The court described that the agency had set an "ever moving and unclarified target for parental success."

{¶ 104} The court posited that if parents had been provided the type of hands-on, in-home services that the foster parents had been given, parents' skills may have been viewed differently. It recognized that B.F.'s issues with head-banging developed after his removal from the home and noted, in particular, that parents had not been provided B.F.'s helmet during visitations and the specifics of B.F.'s Individual Family Services Plans were never shared with them.

{¶ 105} The court clarified that it was not requiring the agency to do "everything possible" to facilitate reunification, but it emphasized that it must act diligently and

39.

provide services appropriate to the family's needs and must at least offer the same opportunities that were provided to the foster parents. It recognized that mother had requested these services. It found that the case plan services did not demonstrate an honest, purposeful effort to reunite the family, and it opined that the agency had an ulterior motive to provide an unfair advantage to the foster parents. It criticized the lack of tailored services to remedy the initial cause of removal—lack of bonding between mother and B.F.

{¶ 106} The court acknowledged that it had previously found that there had been reasonable efforts toward reunification, but it explained that "it was only at the trial with sworn testimony did [sic] the agency's true and non diligent efforts bubble up to the surface."

{¶ 107} The court specifically found Dr. Connell's testimony "not believable, persuasive, convincing or reliable." It was critical of Dr. Connell's failure to update and supply the court with a current CV and to obtain more recent training or education. It was concerned that Dr. Connell did not believe there was a difference between a parenting evaluation and a custody evaluation. It gave "no credence" to his resulting evaluation or his opinions concerning parents' ability to provide a safe and stable environment for B.F. The court observed that Dr. Connell had formed opinions without ever observing parents or foster parents with B.F.

40.

{¶ 108} The court recognized that father was compliant with case plan services (including budgeting, parenting, and mental health programs), completed visitations at Village House, where he handled B.F.'s needs, has been gainfully employed throughout the proceedings, and has safe and suitable housing for B.F. The court, therefore, concluded that the agency failed to establish by clear and convincing evidence that permanent custody should be granted. It noted that it could not consider whether foster parents should be awarded legal custody because no such request or motion was before the court. The court ordered that legal custody be returned to father and temporary custody with the agency be terminated, with the following caveats:

(1) That a successor GAL be appointed to protect B.F.'s interests going forward while B.F. adjusts during the reunification process;

(2) That father successfully complete individualized anger management and parenting programs and cooperate with child protection services in his residential county in regard to particularized services recommended;

(3) That the agency contact the child protection services in father's residential county to assist the family with particularized services in transitioning and parenting B.F.; and

(4) That mother be granted only supervised visitation with the child.

**M. The agency appeals.**

{¶ 109} The agency appealed the trial court judgment. We granted a stay pending appeal after the trial court declined to do so. The agency assigns the following errors for our review:

1. The Trial Court went against the manifest weight of the evidence in denying the Agency's permanent custody motion and awarding legal custody of B.F. to Father subject to conditions, and without issuing appropriate findings regarding B.F.'s best interest.

2. The Trial Court abused its discretion in failing to issue sufficient best interest findings for B.F. relative to the Agency's motion for permanent custody and court's decision to return legal custody to Father.

3. The Trial Court abused its discretion in finding that the Agency has not been relieved of its statutory responsibilities to engage in reasonable efforts to facilitate reunification.

4. The Trial Court abused its discretion when it failed to accord appropriate weight to the psychological expert.

5. The Trial Court abused its discretion when it failed to examine or accord appropriate weight the opinion of the GAL.

## II. Law and Analysis

{¶ 110} In its first assignment of error, the agency argues that the trial court's decision denying its motion for permanent custody and awarding custody to father was

42.

against the manifest weight of the evidence. In its second assignment of error, the agency argues that the trial court abused its discretion by failing to issue sufficient best-interest findings and by returning legal custody to father. In its third assignment of error, the agency argues that the trial court abused its discretion when it found that the agency had not been relieved of its statutory duty to engage in reasonable efforts to reunify B.F. with his parents. And in its fourth and fifth assignments of error, the agency argues, respectively, that the trial court failed to accord proper weight to the opinions of its psychological expert and the GAL.

{¶ 111} The agency combines its discussions of its first and second assignments of error, but we discuss each separately. We also address its assignments of error out of order. Before doing so, we briefly summarize the analysis that a court must conduct where a children services agency moves for permanent custody.

{¶ 112} R.C. 2151.414 provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children's service agency. Under that statute, the court must first find by clear and convincing evidence that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists. Here, the agency relies on R.C. 2151.414(B)(1)(d) in support of its motion for permanent custody. As such it was required to prove (1) that B.F. has been in the temporary custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22–month period, and (2) that it is in

43.

B.F.'s best interest that permanent custody be awarded to the agency. *See In re Johnathon A.*, 6th Dist. Lucas Nos. L-05-1314, L-05-1315, 2006-Ohio-2115, ¶ 55. An agency that seeks permanent custody of a child bears the burden of proving that the grant of permanent custody is in the child's best interest. *In re T.J.,* 2021-Ohio-4085, 180 N.E.3d 706, ¶ 38 (6th Dist.), citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26.

{¶ 113} All of the court's findings under R.C. 2515.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

### A. The court made best-interest findings.

{¶ 114} In its second assignment of error, the agency argues that the trial court abused its discretion by expressly declining to make any findings regarding B.F.'s best interests, despite acknowledging its duty to do so. It urges that there was evidence available to the trial court to allow for best-interest findings.

**{¶ 115}** Mother ignores this specific argument. Father responds that the statute does not require the court to make best interest findings—it merely requires the court to "consider" B.F.'s best interests. Father claims that if the statute required it to do more than "consider" the child's best interests when ruling on an agency's motion for permanent custody, it could have explicitly stated this by requiring the court to "find" that permanent custody in favor of the agency is in the child's best interest. Father insists that the trial court "having considered the issue of best interests of BF and then ruling that it cannot make a finding satisfies the requirements of the statute."

**{¶ 116}** R.C. 2151.414(D)(1) sets out a non-exhaustive list of factors the court must consider in determining whether it is in the best interest of a child to grant an agency's motion for permanent custody:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

45.

agencies * * * for twelve or more months of a consecutive twenty-two-

month period * * *;

(d) The child's need for a legally secure permanent placement and

whether that type of placement can be achieved without a grant of

permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this

section apply in relation to the parents and child.[2]

{¶ 117} The Ohio Supreme court has held that the juvenile court must consider the

best-interest factors in R.C. 2151.414(D)(1)(a) through (e), but it need not expressly

discuss each factor or make specific findings regarding each factor. *In re A.M.* at ¶ 31,

33. The court explained that "a reviewing court must be able to discern from the

magistrate's or juvenile court's decision and the court's judgment entry that the court

satisfied the statutory requirement that it consider the enumerated factors," but it declined

to require "that the court include in its decision a written discussion of or express findings

regarding each of the best-interest factors." *Id.* It recognized that a juvenile court's

---

[2] "The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated." *In re A.M.* at ¶ 19.

46.

consideration of the best-interest factors may be "scattered" throughout the court's judgment. *Id.* at ¶ 38.

{¶ 118} Here, the court said that it was "not able to make sufficient best interest findings pursuant to RC 2151.414(D)(1)(a)-(e)." However, it is apparent that the trial court *did* make best-interest findings. It devoted a paragraph to each of the factors, making clear that it, in fact, considered all of them.

{¶ 119} Under R.C. 2151.414(D)(1)(a), the court found that B.F. has a loving, safe, healthy, and supportive relationship with his foster parents, lives in a safe and suitable environment, and has received wonderful care from his service providers. It also found that B.F. and father have a bond. The court criticized the agency for failing to afford B.F. the opportunity to develop more meaningful interaction and interrelationships with his parents.

{¶ 120} Under R.C. 2151.414(D)(1)(b), the court found that B.F.'s age prevented it from conducting an in camera interview. The court specifically stated that it took into account the GAL's recommendations.

{¶ 121} Under R.C. 2151.414(D)(1)(c), the court found that B.F. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period.

{¶ 122} Under R.C. 2151.414(D)(1)(d), the court acknowledged that B.F., like every child, needs a legally secure, healthy, and stable living environment, but it found

47.

that there was "not credible evidence to support [B.F.'s] need for a legally secured placement without a grant of permanent custody to the agency."

{¶ 123} And under R.C. 2151.414(D)(1)(e), the court found that there was no credible and reliable evidence to support any of the factors listed in R.C. 2151.414(E)(7) to (11).

{¶ 124} Because the court addressed each factor and made specific findings as to each of them, it is impossible to conclude that the court did not "consider" the best-interest factors. The more reasonable interpretation of the trial court judgment is simply that the court found it necessary to consider additional factors in determining B.F.'s best interest—most significantly, the reasonableness of the agency's efforts to reunify B.F. with his parents.

{¶ 125} In *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, at ¶ 19, the Ohio Supreme Court described that the list of factors set forth in R.C. 2151.414(D)(1) is a "non-exhaustive list." And by its own terms, R.C. 2151.414(D)(1) requires the court to consider *all* relevant factors. Here, the trial court considered all the enumerated best-interest factors, in addition to other factors that it found relevant. As such, we find no abuse of discretion by the trial court.

{¶ 126} We find the agency's second assignment of error not well-taken.

## B. The court properly considered reasonable efforts in its best-interest analysis.

48.

{¶ 127} In its third assignment of error, the agency argues that the trial court abused its discretion in finding that the agency was not relieved of its statutory responsibility to engage in reasonable efforts to facilitate reunification. It emphasizes that an agency need not demonstrate reasonable efforts at a hearing on a motion for permanent custody filed under R.C. 2151.413 unless (1) the trial court relies on R.C. 2151.414(E)(1); or (2) reasonable efforts have not been established before the hearing. It maintains that it was not required to demonstrate reasonable efforts at the permanent custody hearing because (1) R.C. 2151.414(E) did not apply, and (2) over the course of two years, the trial court repeatedly determined that the agency had made reasonable efforts and parents did not object to the reasonableness of the agency's efforts.[3] Father responds that the agency was required to show reasonable efforts to facilitate reunification because none of the exceptions provided in R.C. 2151.419(A)(2) apply.

{¶ 128} The Ohio Supreme Court has recognized that by its terms, R.C. 2151.419 "does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41. But, it explained, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts." *Id.* at ¶ 42. "Based on the constitutional implications of terminating parental rights and the importance of requiring

---

[3] The agency also argues that the evidence demonstrated that it *did* engage in reasonable efforts to facilitate reunification; father challenges this assertion. We will address those arguments when we consider the agency's challenge to the weight of the evidence.

49.

reasonable reunification efforts that pervades federal and Ohio law, * * * except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family" before seeking to terminate parental rights. *Id.* at ¶ 21, 43. The "narrowly defined exceptions" are set forth in R.C. 2151.419(A)(2) (none of which are argued in this case).

{¶ 129} In fact, "[u]nder R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody under R.C. 2151.413(D)—the '12 months out of 22' rule—'[i]f reasonable efforts to return the child to the child's home are required under section 2151.419' and the agency has not provided the services required by the case plan." *In re C.F.* at ¶ 29. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.*

{¶ 130} Here, as the agency emphasizes, the trial court previously determined that the agency had engaged in reasonable efforts to facilitate reunification of B.F. with his parents. The issue as we see it is whether the trial court, after making reasonable-efforts findings, can change its mind and conclude otherwise after hearing sworn testimony at the permanent-custody hearing.

{¶ 131} As we recognized when we addressed the agency's second assignment of error, the list of best-interest factors set forth in R.C. 2151.414(D)(1) is a "non-exhaustive list," and a trial court may consider additional factors in determining whether permanent

custody in favor of the agency was in the child's best interest. *See In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, at ¶ 19. In *In re H.H.*, 9th Dist. Summit No. 25463, 2010-Ohio-5992, the Ninth District recognized that the trial court had made reasonable-efforts determinations during the course of the case, thus the agency was not required to prove reasonable efforts at the permanent custody hearing. Nevertheless, because a juvenile court must consider all relevant factors in determining a child's best interest, the court considered mother's reasonable-efforts arguments "in the context of the impact that the efforts of the agency had upon the best interest determination." *Id.* at ¶ 17.

{¶ 132} This is essentially what happened in the present case. The court made numerous reasonable-efforts findings over the life of this case. But, it explained, at the trial, when sworn testimony was presented, "the agency's true and non diligent efforts bubble[d] up to the surface." In other words, when the trial court had the entire picture in front of it—sworn testimony from the agency's witnesses, sworn testimony from the parents' witnesses, properly-authenticated exhibits—it was convinced that its previous findings were mistaken. We find that the trial court was permitted to reconsider reasonable efforts as part of its best-interest analysis, and it was not bound by its previous reasonable-efforts findings made over the duration of the case. The trial court did not abuse its discretion.

{¶ 133} We find the agency's third assignment of error not well-taken.

51.

### C. The trial court judgment was not against the manifest weight of the evidence.

{¶ 134} In its first assignment of error, the agency argues that the trial court's decision to deny its motion for permanent custody without making best-interest findings rendered its decision against the manifest weight of the evidence. We have already rejected the agency's claim that the trial court failed to make best-interest findings. We, therefore, turn to its more specific challenges to the trial court's judgment denying its motion for permanent custody and awarding custody to father.

{¶ 135} The agency complains that the court failed to explain why (1) an award of permanent custody to the agency is *not* in B.F.'s best interest, or (2) why an award of legal custody to father *is* in B.F.'s best interest. It acknowledges that evidence of case plan compliance is relevant to a best-interest determination, but it emphasizes that even where a parent has complied with the goals of the case plan, parental rights may be terminated for a reason not in the case plan. It maintains that the real issue is whether the parent has substantially remedied the conditions that caused the child's removal—not simply whether the parent has substantially complied with the case plan. The agency insists that the evidence in the present case demonstrates that parents did not substantially remedy the conditions that caused B.F.'s removal because they failed to utilize and demonstrate newly-learned parenting skills during visits, retain information related to parenting, appropriately supervise B.F., and obtain stable and hazard-free housing.

52.

{¶ 136} The agency also challenges the court's reasonable-efforts findings. It urges that parents received information and notice from the foster parents about B.F.'s medical appointments, yet rarely attended those appointments. It contends that parents were not involved in Early Intervention services because they never progressed beyond the highest level of supervised visitation with B.F. And it insists that the agency caseworker informed parents of B.F.'s developmental and medical needs and accommodations.

{¶ 137} Finally, the agency questions how the trial court could award legal custody to father and only supervised visitation to mother, when parents are legally married and reside in the same home.

{¶ 138} Father responds that parents complied with case plan services, the caseworker testified that father is not in need of additional services, and parents have taken measures to provide for healthcare and daycare in their current county of residence. He emphasizes that under the trial court judgment, the agency will remain engaged with the family because father must participate in anger management training and an individualized parenting plan and must cooperate with children services where father lives.

{¶ 139} Mother argues that despite complaining that father's mental health and mother's intellectual delay prevented them from caring for their child, the agency never recommended hands-on, intensive courses to teach them to properly parent a special-

needs child. She claims that foster parents received the benefit of hundreds of hours of services, but parents did not. Mother insists that she expressly asked the agency for help with her intellectual disability, but the agency made no referrals. She also criticizes the agency for its caseworker's failure to observe parents with B.F. the entire time they were visiting him at Village House, and emphasizes that the Village House executive director expressed no concerns about father's ability to care for B.F.

{¶ 140} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.* 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis in original.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). It requires us to weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Thompkins* at *id*.

{¶ 141} But while we review the evidence and consider witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be

accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'"  (Internal citations omitted.)  *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 142} The evidence supports the trial court's conclusion that B.F. has a loving, safe, healthy, and supportive relationship with his foster parents, lives in a safe and suitable environment, and has received wonderful care from his service providers.  The evidence also supports the trial court's conclusion that B.F. and father have a bond, B.F.'s age prevented it from conducting an in camera interview, and B.F. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period.  The agency does not challenge these conclusions.

{¶ 143} The agency's challenge to the trial court's judgment really revolves around (1) the court's alleged failure to make best-interest findings (addressed above in Section II(A)); (2) the court's inclusion of a reasonable-efforts analysis (addressed above in Section II(B)); (3) the court's criticism of the agency for failing to afford B.F. the opportunity to develop more meaningful interaction and interrelationships with his parents; (4) the court's rejection of most of Dr. Connell's opinions (discussed below in Section II(D)); (5) the weight afforded the GAL's recommendations (addressed below in Section II(E)); (6) the court's conclusion that there was "not credible evidence to support [B.F.'s] need for a legally secured placement without a grant of permanent custody to the agency"; (7) the court's conclusion, after reexamining the agency's efforts to reunite

55.

parents and B.F., that the agency did not make reasonable efforts; and (8) the award of legal custody only to father, while he remains married to mother.

{¶ 144} The trial court found that the agency did not make reasonable efforts to facilitate reunification of parents with their child. "Reasonable effort" is "an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." (Internal quotations and citation omitted.) *In re T.C.*, 2023-Ohio-1922, 216 N.E.3d 811, ¶ 33 (6th Dist.). "In determining whether the agency made reasonable efforts, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." (Internal quotations and citation omitted.) *Id.*

{¶ 145} The court found that the agency should have known in the early stages of the case that to reunify B.F. with his parents, it would need to address parents' intellectual disabilities, cognitive behavioral concerns, and parenting skills that were of concern to the agency. It found that the agency provided only "typical and normal" case plan services when it should have known that parents would not succeed with only standard case plan services. And it posited that if parents had been provided the type of hands-on, in-home services that the foster parents had been given, parents' skills may have been viewed differently.

{¶ 146} We have carefully reviewed the record in this case. In seeking permanent custody of B.F., the agency sought to drive home the point that B.F. is not an average

56.

child with average needs; B.F. is more complicated and will require special services, therapies, and a greater level of attention than many other children. It offered opinions from the GAL, Foote, and Dr. Connell expressing skepticism over whether parents could meet B.F.'s special needs. It sought to compare and contrast parents' ability to care for B.F. versus the foster parents' ability.

{¶ 147} Despite emphasizing B.F.'s special needs, the agency offered parents only typical case-plan services, but expected them to implement skills appropriate to B.F.'s specific needs. It minimized the fact that foster parents were given the benefit of hands-on instruction, frequent in-home visits from and direct communication with Early Intervention, and control over scheduling medical visits. Foster parents were given tools—personal demonstrations of helpful exercises, advice to pad B.F.'s crib and provide him with a soft helmet to protect his head, instruction on baby sign language— that permitted them to better care for B.F. Parents were left to figure things out on their own and were criticized for not doing that quickly enough in the few hours per week that they were able to spend with him. Early Intervention specialists were told that parents would not be included until reunification was imminent. The reality was that reunification was never going to be possible without educating parents on how to meet B.F.'s special needs. Parents were at a disadvantage.

{¶ 148} Parents' disadvantage was further widened by the fact that not only is B.F. not an average child, parents are not average parents. The agency repeatedly emphasized

57.

that mother is cognitively impaired and both parents have mental health issues. The caseworker and GAL both questioned parents' ability to comprehend and remember information pertinent to B.F.'s medical needs. Yet, as new delays were identified in B.F.'s development, still no instruction was provided to parents. Any legitimate effort at reunification required, at a minimum, that parents be given the same level of instruction that was provided to foster parents, including hands-on training. But it likely also required additional referrals to address parents' own impairments.

{¶ 149} Ultimately, what the agency must keep in mind is that *it* had the burden to prove by clear and convincing evidence that the grant of permanent custody is in B.F.'s best interest. *Matter of E.T.,* 2023-Ohio-444, 208 N.E.3d 910, ¶ 104 (7th Dist.), citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. After carefully reviewing the evidence, we cannot say that the trial court's conclusion—that the agency failed to meet its burden—was against the manifest weight of the evidence. To the contrary, the record supports the trial court's findings and conclusions.

{¶ 150} As for the agency's concern over the court awarding custody to father, subject to conditions, and while he is still married to and living with mother, who is permitted only supervised visitation, the court's judgment provided for continued oversight of this family. If problems arise, certainly they can be addressed as appropriate.

{¶ 151} We find the agency's first assignment of error not well-taken.

58.

## D. The trial court was free to accept or reject expert opinions.

{¶ 152} In its fourth assignment of error, the agency argues that the trial court abused its discretion in affording no weight to most of the opinions offered by clinical psychologist, Dr. David Connell. It points out that parents stipulated to Dr. Connell's expertise and did not object to the admission into evidence of Dr. Connell's report. The agency questions why the court would accept Dr. Connell's opinions concerning mother's intellectual functioning, yet disregard his opinions concerning father's intellectual and cognitive functioning, when both opinions were the product of careful testing and analysis. It acknowledges that the court offered some reasons for distrusting Dr. Connell's opinions—i.e. the doctor did not update his CV, he opined that parenting evaluations and custody evaluations are similar, and he failed to observe parents interact with B.F.—but it maintains that it was inconsistent for the court to accept some of Dr. Connell's opinions (i.e., that mother has an intellectual disability), yet reject others without explaining the reason for the inconsistency.

{¶ 153} Father responds that Dr. Connell's report should not have been given weight because it was stale, he did not test father's IQ, he did not follow up on father's history of PTSD, he did not observe B.F. and parents interact before drafting his report, and he performed a substandard evaluation. Mother argues that it has long been

59.

established that she has intellectual delays, so it was not error for the trial court to accept that opinion from Dr. Connell while rejecting other of his opinions. She insists that Dr. Connell's report—by his own admission—was below the standard of care for a parenting assessment because the standard of care required him to observe parents interacting with the child, and he did not do this.

{¶ 154} The trial court was critical of Dr. Connell's failure to update and supply the court with a current CV and to obtain more recent training or education. It was concerned that Dr. Connell did not believe there was a difference between a parenting evaluation and a custody evaluation, suggesting to the court that Dr. Connell's evaluation did not satisfy the evaluation requirements set forth in Sup.R. 91.01 to 91.09. The court observed that Dr. Connell had formed opinions without ever observing parents or foster parents with B.F. It gave "no credence" to his resulting evaluation or his opinions concerning parents' ability to provide a safe and stable environment for B.F.

{¶ 155} "[I]ssues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.,* 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

60.

{¶ 156} Moreover, a court acting as the trier of fact "can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact * * *." *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 82, 228 N.E.2d 304 (1967). It "'may believe or disbelieve any witness or accept part of what a witness says and reject the rest.'" *Id.,* quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 157} Here, the juvenile court did not act inconsistently in accepting some, but not all of Dr. Connell's opinions. Even Dr. Connell conceded that if he had performed the IQ test first, he probably would not have administered the MMPI to mother due to her reading level. Moreover, the court was properly concerned that Dr. Connell had not observed parents interact with B.F., and it was not required to give any particular weight to Dr. Connell's interpretation of the results of father's MMPI and how that potentially related to father's ability to parent. Accordingly, we conclude that the trial court did not abuse its discretion in affording little weight to most of Dr. Connell's opinions.

{¶ 158} We find the agency's fourth assignment of error not well-taken.

**E. The court was not obligated to follow the GAL's recommendation.**

{¶ 159} In its fifth assignment of error, the agency argues that the trial court abused its discretion when it failed to adequately examine or afford proper weight to the GAL's opinions. It summarizes the duties of the GAL to assist the juvenile court in its determination of the child's best interests, and emphasizes that B.F.'s GAL opined that parents were unable to effectively parent B.F and manage his needs. The agency

61.

complains that the juvenile court ignored the GAL's opinions without making any determination regarding her credibility.

{¶ 160} Father responds that the Rules of Superintendence do not require the court to give the GAL's recommendations any particular weight. He maintains that the trial court was free to assign the GAL's recommendations whatever weight it deemed appropriate. Mother argues that the GAL failed to meet the minimum requirements of Sup.R.48 because she was evaluating the child's best interests as between parents and foster parents even though permanent custody in favor of the foster parents was a legal impossibility given the procedural posture of the case. She also criticizes the GAL for failing to (1) recommend that parents receive the same hands-on services that had been provided to the foster parents, (2) observe parents' interaction with B.F. after they had completed parenting classes, and (3) visit parents' Michigan home and interview their housemates. Mother complains that B.F. was a two-year-old toddler at the time of the custody hearing, but the GAL had not seen parents interact with him since he was a baby.

{¶ 161} As the trier of fact, the juvenile court is permitted to consider the GAL's testimony and recommendation in the context of all the evidence before it. *Matter of B.T.,* 10th Dist. Franklin No. 21AP-485, 2022-Ohio-4093, ¶ 38. But the juvenile court determines the credibility and weight to give to the report and is not compelled to follow the GAL's recommendation. *In re A.K.,* 6th Dist. Ottawa No. OT-20-001, 2020-Ohio-4700, ¶ 46. Ultimately, the juvenile court must decide what is in the child's best interest

after considering all the evidence presented. *In re C.T.,* 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, ¶ 80.

{¶ 162} The GAL articulated her concerns about returning custody of B.F. to his parents: (1) whether parents have an adequate home, and (2) whether they can provide adequate care for B.F.'s special needs. As to her first concern, the GAL testified that she had never been to parents' current home. And as to her second concern, when the GAL testified on direct, B.F. was approximately 22 months old and it had been nearly a year since she had last seen parents interact with him.[4] Under the circumstances, it would seem that the GAL's opinions were of limited assistance.

{¶ 163} In any event, the trial court clearly stated that it considered the GAL's recommendation. It was not required to follow her recommendation. We find no abuse of discretion in the weight the trial court afforded the GAL's opinions.

{¶ 164} We find the agency's fifth assignment of error not well-taken.

### III. Conclusion

{¶ 165} The trial court made best-interest findings, and those findings were not against the manifest weight of the evidence. The court was permitted to consider reasonable efforts to reunify the family as part of its best-interests analysis, and it was not

---

[4] The GAL apparently observed a visit on April 14, 2023, three days after she testified on direct and four days before she testified on cross-examination. On cross-examination, she agreed that during the visit she observed, parents responded appropriately to the child's head-banging.

63.

bound by its previous findings. It was within the court's discretion what, if any weight, to assign the opinions of the agency's expert and the GAL. The agency's five assignments of error are not well-taken.

{¶ 166} We affirm the June 23, 2023 judgment of the Ottawa County Court of Common Pleas, Juvenile Division, denying the agency's motion for permanent custody and awarding custody to father, with supervised visitation to mother. The stay granted by this court on July 31, 2023, is hereby dissolved. Custody of B.F. shall be transferred to father within seven days of this order. The Ottawa County Department of Job and Family Services is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE
Myron C. Duhart, P.J.

　　　　　　　　　　　　　　　　　　　　　　_____
Charles E. Sulek, J.　　　　　　　　　　　　　　JUDGE
CONCUR.

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

65.